**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Action No.   11-cr-00355-MSK

UNITED STATES OF AMERICA,

    Plaintiff,

v.

    1. WAUNITA WEINGART
    **2. JOHN PHILLIP GALLEGOS**
    3. ALOIS CRAIG WEINGART

    Defendants.

---

**DEFENDANT JOHN GALLEGOS' PROFFER REGARDING METHODOLOGY USED AND APPLIED AS WELL AS FACTS AND DATA REQUIRED AND CONSIDERED BY ROBERT KULLMAN**

---

    John Gallegos, by and through counsel William L. Taylor and Darlene A. Bagley of the firm Ridley, McGreevy & Winocur, P.C., hereby submits his Proffer Regarding Methodology Used and Applied as well as Facts and Data Required and Considered by Robert Kullman.

## Opinions 1-3

<u>Methodology Used by Robert Kullman</u>

    In reaching Opinions 1-3 as set forth in the Joint 702 pleading, Mr. Kullman employed the methodology set forth in ASTM Standard E-2290-07a, the Standard Guide for the Examination of Handwritten Items, as well as the ASTM Standard Guide for Expressing Conclusions.  These methodologies are the recommended, accepted standards in the field.

    The Standard Guide for the Examination of Handwritten Items outlines the procedure to be employed when conducting examinations and comparisons involving handwritten items.  In using this Standard, an examiner must keep in mind section (3.3.15.1), the discussion of which specifies that no two writings of the same material by the same writer are identical in every detail.  The Standard instructs the examiner to separate the questioned writing into groups if there is more than one type of writing.  (*See* Section (7.7.1).)  Further, the Standard instructs that, if there are inconsistencies

1

within the groups created, the examiner is to divide the groups into subgroups. (*See* Section (7.7.2).) The examiner should then determine the range of variation for each group and determine the presence or absence of individualizing characteristics. (*See* Sections (7.10.3) and (7.10.4).)) With original documents, microscopic evaluation may be conducted. A side-by-side comparison is then conducted to determine whether there are differences, absent characters, similarities, as well as to analyze other potentially significant features present. (*See* Section (7.12) and related Note 6.) The examiner then forms a conclusion according to the Standard Guide for Expressing Conclusions

The Standard Guide for Expressing Conclusions employs a range of nine conclusions to be offered in handwriting comparison. These conclusions are as follows:

1- The questioned writing and the known writing were written by the same person.
2- It is highly probable that the questioned writing and the known writing were written by the same person.
3- It is probable that the questioned writing and the known writing were written by the same person.
4- There are indications that the questioned writing and the known writing were written by the same person. (*This is a very weak opinion, and far from conclusive. The evidence falls far short of that necessary to support a definite conclusion.)
5- No conclusion can be drawn, meaning there are as many similarities as there are differences within the writing.
6- There are indications that the questioned writing and the known writing were not written by the same person.
7- It is probable that the questioned writing and the known writing were not written by the same person.
8- It is highly probable that the questioned writing and the known writing were not written by the same person.
9- The questioned document and the known document were not written by the same person. (*This is the most difficult opinion to render.)

Limitations affect the ability to render opinions using the Standard outlined above. Limitations include, but are not limited to, having photocopied documents (meaning, not the original) or having a limited amount of questioned or known documents. (See Section (5.2).)

Manner in which Said Methodology was Applied

As evidenced by the notes provided to the government, Mr. Kullman applied the methodology as outlined in the ASTM Standard Guide for Examination of Handwritten Items. He identified all of the writings at issue (the signatures in notebooks one through

2

four) and made the initial determination of whether the writings were similar or if the writings needed to be separated into groups of single types of writing.  Mr. Kullman made the initial determination that ten writings appeared identical, meaning they had a common parent or one of the ten was the parent.

     Mr. Kullman prepared a cut-and-paste chart with all of the writings.  In comparing the writings, he determined that all writings did not have internal consistency.  Thus, he then separated the writings into three groups using the identical signatures and the signature on the driver's license as known samples.  The groups were created as follows:  one group having what appeared to be some similarities but also differences, which included the identical signatures; another group that contained abbreviated signatures appearing to have internal consistency with the first name, but, again, for which limitations existed; and one group that did not have internal consistency with each other or either of the other groups and for which it appeared as if there may have been multiple writers.

     Mr. Kullman then formed his opinion in accordance with the Standard Guide for Expressing Conclusions.  He opined that the ten identical signatures came from a common source.  He then opined that the first two groups (A and B) fit conclusion 4 of the Standard Guide for Expressing Opinions:  there are indications that the questioned writing and the known writing were written by the same person. (Again, this is a very weak opinion, and far from conclusive.  The evidence falls far short of that necessary to support a definite conclusion.)  Finally, Mr. Kullman opined that the third group (C) fit conclusion 6:  There are indications that the questioned writing and the known writing were not written by the same person.  More definite opinions could not be made because of the limitations of the documents.

<u>Facts and Data to be Considered by Said Methodology</u>

     As outlined above, the facts and data to be considered are known writings in comparison to questioned writings.  Original documents (or documents without the limitations listed in Section 5) are preferred for use in said evaluation.  If original documents are not available, the best available reproduction should be used.  Said reproduction must be reproduced with sufficient clarity for comparison purposes.

<u>Facts and Data Actually Considered</u>

     Known signatures considered by Mr. Kullman were the identical signatures (likely created by using a signature stamp) as well as the signature on Mr. Gallegos' driver's license.  The other signatures were treated as questioned signatures.

     Per the government, original documents are not available.  Thus, the best available reproductions made available to the defense were provided to Mr. Kullman.

3

As these reproductions are not original documents, a microscopic examination was not conducted as he could not have looked into the line to determine direction of stroke, pressure, rapidity of stroke, etc. Rather, Mr. Kullman enlarged each photocopied signature for comparison and conducted his examination using that information.

Because originals were not available (thus presenting inherent limitations), Mr. Kullman's opinion is likewise limited.

## Opinion 4

Methodology Used by Robert Kullman

The ASTM Standard Guide for Examination of Handwritten Items (E-2290-07a) posits that documents may have inherent limitations that may interfere with the procedures in the Guide. As stated in E-2290-07a (5.2), "Limitations can be due to submission of non-original documents, limited quantity or comparability, or condition of the items submitted for examination." In section (7.5.1) the Guide goes on to state, "If the original is not submitted, evaluate the quality of the best available reproduction to determine whether the significant details of the writing have been reproduced with sufficient clarity for comparison purposes and proceed to the extent possible."

Section (7.12.4)(Note 6) outlines features to be considered as elements of writing, some of which may be difficult if not impossible to discern without the original document:

> Abbreviation; alignment; arrangement; formatting; positioning; capitalization; connectedness and disconnectedness; cross strokes and dots, diacritics and punctuation; direction of strokes; disguise; embellishments; formation; freedom of execution; handedness; legibility; line quality; method of production; pen hold and pen position; overall pressure and patterns of pressure emphasis; proportion; simplification; size; skill; slant or slope; spacing; speed; initial, connecting, and terminal strokes; system; tremor; type of writing; and range of variation; … lifts stops and hesitations of the writing instrument; patching and retouching; slow, drawn quality of the line; unnatural tremor; and guide lines of various forms.

Manner in which Said Methodology was Applied

As originals were not provided, Mr. Kullman was unable to examine the documents for many of the above elements of writing. However, in accordance with the ASTM Standard Guide, Mr. Kullman evaluated the best available reproduction for what can be examined using photocopies. Also in accord with the ASTM Standard Guide,

with the limitations inherent in photocopies, Mr. Kullman could not opine with a great deal of certainty.

Facts and Data to be Considered by Said Methodology

The facts and data to be considered using this methodology is outlined in Section (7.12.4)(Note 6) of the Standard Guide.

Facts and Data Actually Considered

Mr. Kullman examined the best available reproductions made available to the defense.  Again, much of the data to be considered in examining writing elements could not be considered due to the absence of original documents.  Specifically, he could not examine the writings microscopically for direction of stroke; disguise; embellishment; formation; freedom of execution; handedness; method of production; pen hold and pen position; overall pressure and patterns of pressure  emphasis; speed; initial, connecting, and terminal strokes; lift stops and hesitations of the writing instrument; patching and retouching; slow, drawn quality of the line; etc.

Mr. Kullman was able to examine the writings (the photocopies in this case) for general, overall letter formations, proportions within letters, proportions between letters, slant, and spatial relationships.

Because of the methodology employed, the forensic examination was hampered/inherently limited by the unavailability of originals, as described generally in ASTM standards 7.12.4, 5.2, and 5.4.  Because of these limitations, there could be no high degree of certainty in Mr. Kullman's opinion because of the possibilities that the writings resulted from "cut and paste" or tracing techniques or were computer generated.  Moreover, the copies produced, although the best available reproductions, are medium-grade copies.  Finally, there were few known samples, which also interfered with the level of certainty in Mr. Kullman's opinion.

## **Opinion 5**

Methodology Used

Mr. Kullman has formed his opinion – that laypersons experience significantly higher error rates in handwriting identification than do professional forensic document analysts – over many years, in reliance  upon his professional training in the field of forensic document analysis; his decades of experience in the field; his consultation with professional colleagues in the field regarding observations pertaining to errors made by trainees and laypeople; and his experience in training individuals in the field of forensic document analysis.

5

In addition to his decades of anecdotal experience, Mr. Kullman's opinion is supported by empirical studies conducted by academics and identified and provided to the government with Rule 702 disclosures. Said studies compared and contrasted the use of the methodology outlined above for Opinions 1-3 by three separate groups: professional forensic document examiners; trainees in the field, and laypeople. The studies then used standard statistical analysis to determine whether or not certain hypotheses (namely, whether there is a difference between assessments provided by professional forensic document examiners and laypersons about genuineness and nongenuineness of signatures) should be accepted or rejected.

Manner in which Said Methodology was Applied

Mr. Kullman has formed his opinion – that laypersons experience significantly higher error rates in handwriting identification than do professional forensic document analysts – over many years, in reliance upon his professional training in the field of forensic document analysis; his decades of experience in the field; his consultation with professional colleagues in the field regarding observations pertaining to errors made by trainees and laypeople; and his experience in training individuals in the field of forensic document analysis.

Of particular significance to the formation of Mr. Kullman's opinion on this subject over decades has been the controlled testing of candidates to become forensic document analysts whom Mr. Kullman has trained. As part of their training, such candidates are tested on their ability to identify the signatures of known samples, under controlled conditions. Candidates are tested for their ability to identify actual signatures and simulated signatures. Mr. Kullman has observed over his many years of training and testing such candidates that there is a great disparity in accuracy rates yielded by testing of fully trained and experienced forensic document analysts compared to those of candidate trainees.

With regard to the studies relied upon by Mr. Kullman in support of his opinion, said studies were published in the American Academy of Forensic Sciences' publication. The studies applied the methodology in a controlled environment. The three groups (professional forensic document examiners; trainees; and laypeople) were given the same assignment: All were provided with known signatures and unknown signatures and were then asked to examine the unknown signatures. Then, they were asked to form opinions in terms of the genuineness of the signatures using the ASTM Standard Guide for Expressing Opinions.

Using the standard statistical analysis, the hypothesis that there is no difference between the assessments provided by professional forensic document examiners and laypersons about genuineness and nongenuiness of signatures was rejected. Further,

6

the study demonstrated that the professional forensic document examiners also performed markedly better than the trainees in forensic document analysis.

Facts and Data to be Considered by Said Methodology

Mr. Kullman has formed his opinion – that laypersons experience significantly higher error rates in handwriting identification than do professional forensic document analysts – over many years, in reliance upon his professional training in the field of forensic document analysis; his decades of experience in the field; his consultation with professional colleagues in the field regarding observations pertaining to errors made by trainees and laypeople; and his experience in training individuals in the field of forensic document analysis.

Also considered by this methodology were the studies conducted using the three groups of examiners: professional forensic document examiners, trainees, and laypersons.

Facts and Data Actually Considered

Mr. Kullman has formed his opinion – that laypersons experience significantly higher error rates in handwriting identification than do professional forensic document analysts – over many years, in reliance upon his professional training in the field of forensic document analysis; his decades of experience in the field; his consultation with professional colleagues in the field regarding observations pertaining to errors made by trainees and laypeople; and his experience in training individuals in the field of forensic document analysis.

Finally, in forming the opinion to which he is prepared to testify in this case, Mr. Kullman re-reviewed the studies referred to above, which corroborate his opinion, formed over decades, with empirical data generated by experimentation under controlled conditions, subjected to statistical analysis, with findings subjected to peer review prior to publication in what may be the most respected journal in his field – the official organ of the American Academy of Forensic Sciences.

Respectfully submitted this 17th day of September, 2012.

*/s/ William L. Taylor*
William L. Taylor, #21098

*/s/ Darlene A. Bagley*
Darlene A. Bagley, #35728
Ridley, McGreevy & Winocur P.C.
303 16th Street, Suite 200
Denver, CO  80202
(303) 629-9700

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of September, 2012, I served a true and correct copy of the foregoing **DEFENDANT JOHN GALLEGOS' PROFFER REGARDING METHODOLOGY USED AND APPLIED AS WELL AS FACTS AND DATA REQUIRED AND CONSIDERED BY ROBERT KULLMAN** via CM/ECF filing addressed to all counsel/parties subscribed for service of CM/ECF filings in this matter.

/s/ *Suzy M. Kamps*

Suzy M. Kamps