IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 11-cr-355-MSK

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.    WAUNITA WEINGART,
2.    JOHN PHILLIP GALLEGOS,
3.    ALOIS CRAIG WEINGART,

      Defendants.

---

**GOVERNMENT'S PROFFER RELATING TO THE METHODOLOGY USED BY
WITNESS DANA CHAMBERLIN AND MEMORANDUM OF LAW**

---

### I. Introduction

    This pleading discusses the methodology used by witness Dana Chamberlin in arriving at her expert opinions, the facts and data required to be considered by that methodology, the manner in which she employed that methodology in this case, and the facts and data she considered. It also includes a memorandum of law pertaining to Ms. Chamberlin's proffered testimony.

### II. The Methodology Used by Dana Chamberlin and the Facts and Data Required to be Considered for that Methodology

    Dana Chamberlin is a certified fraud examiner and certified public accountant. In connection with her expert opinions, she  employed the fraud examination methodology endorsed by the Association of Certified Fraud Examiners as set forth in *The*

1

*Fraud Examiner's Manual*, 2012 US Edition (hereinafter "FEM").[1]

This methodology requires that there first be a sufficient reason (predication) to conduct a fraud examination. A predication is the totality of circumstances that would lead a reasonable, professionally trained, and prudent individual to believe that a fraud has occurred, is occurring, and/or will occur. (FEM I-7). If a predication exists, the examiner is then to follow the fraud theory approach.

The fraud theory approach begins with the assumption, based on the known facts, of what might have occurred. (FEM I-7). The fraud theory approach requires the examiner to then analyze the available data, create a hypothesis, test the hypothesis, and refine or amend the hypothesis. (FEM I-7). The examiner's initial efforts are to be spent identifying, collecting, and securing all possibly relevant documents. (FEM 3.401). A fraud examiner is to strive to make certain that all relevant documents are included in her analysis, and that all irrelevant documents are eliminated. (FEM 3.101). At each step in the fraud examination process, the evidence obtained is to be continually assessed. (FEM I-7).

The fraud theory approach takes into account that each specific fraud has its own unique characteristics, (FEM I-9), that fraudulent intent must be established (FEM I-15), and that white collar perpetrators typically take steps to conceal the fraud from their victims (FEM I-15 - I-16). To hide their actions, fraud perpetrators often create complex financial trails. (FEM I-16).

In a case in which financial transactions are to be traced directly, the fraud examiner must obtain all available relevant financial records. (FEM 3.805). The fraud theory

---

[1] The sections of *The Fraud Examiner's Manual* cited herein are included in Attachment 1.

approach recognizes bank records as the single most important source of financial information available to a fraud examiner. (3.805). Where a potential loan fraud is the basis of the examination, as here, the lenders' records relating to the suspect loans are the most directly relevant records to be considered.

In this case, the FBI began an investigation of what appeared to be mortgage fraud. Ms. Chamberlin was informed that Waunita Weingart, Alois Craig Weingart, and John Phillip Gallegos (hereinafter "the subjects") had repeatedly refinanced their residential properties located at 7766 Saxeborough Drive, Castle Rock, Colorado and 141 Lost Angel Road, Boulder, Colorado (hereinafter "Saxeborough" and "Lost Angel") without paying off the prior outstanding mortgages.  She was also informed that their title companies, Colorado County and Community Title, LLC (hereinafter "CCCT") and Real Estate Title, LLC, (hereinafter "RET") were involved in the closings.

Based on this predication, Ms. Chamberlin assumed that mortgage fraud may have been committed by the subjects in connection with their refinancings of their properties on Saxeborough and Lost Angel and that they may have used their title companies to facilitate the fraud.  Ms. Chamberlin first acquired bank account records for the subjects' personal and business accounts, as well as the lenders' records for the loans then known to be in question. She then summarized the bank account records and began analyzing both sets of documents. This work led her to discover new sources of relevant data, which she subsequently obtained. The additional material included bank account information for other accounts controlled by one or more of the subjects,[2] lenders' records

---

[2] There were ultimately twenty-six bank accounts in all.

pertaining to other loans acquired by the subjects for the refinancings of Saxeborough and Lost Angel, and public records relating to the relevant properties and mortgages.

As her analysis of the lenders' records and bank records progressed, Ms. Chamberlin created various hypotheses, which she then tested. Where a hypothesis could not be proved, she amended and retested it. In order to describe the manner in which she applied the above-described methodology, and which specific parts of the bank records and lenders' records she considered, her opinions have been grouped here by topic.[3] The specific opinions derived from her application of this methodology are set forth in the Parties' Second Amended Joint Motion Under Fed.R.Evid. 702 (Doc. 160).

### III. The Manner in Which the Methodology was Applied and the Facts and Data Considered

**A.**      **Ms. Chamberlin's Analysis of the Inter-Relationships Among Liabilities Listed on the Subjects' Applications for their Refinancings of Saxeborough and Lost Angel, Information Listed in the Schedules of Real Estate Owned Set Forth in those Applications, Mortgage Liabilities Listed on Credit Reports Used in the Application Process for Those Loans, and the Subjects' Prior Mortgages**

1.      Analysis of available data: Given the above-described predication that the subjects repeatedly acquired loans to refinance Saxeborough and Lost Angel, but did not pay off the prior mortgages in the process, Ms. Chamberlin reviewed the subjects' loan applications to see if their loans to refinance Saxeborough and Lost Angel were being represented as liabilities on their subsequent loan applications. In particular, she reviewed the "Liabilities" and "Schedule of Real Estate Owned" sections of those applications. In

---

[3]In some respects, her analysis of certain records pertaining to the different topics was done nearly simultaneously.

reviewing the Schedule of Real Estate Owned, she noticed that on each application, only one outstanding mortgage was listed for Saxeborough and/or Lost Angel. She also noticed that there were multiple other properties listed in the Schedule of Real Estate Owned identified as having outstanding mortgages. Whereas the Schedule of Real Estate Owned section identified each property by street address and gave an outstanding mortgage balance, the "Liabilities" section did not require addresses be provided for the listed mortgage liabilities.[4]

Based on her training, experience, and specialized knowledge as a certified fraud examiner, and in particular as a certified fraud examiner of mortgage fraud, she knew that the mortgage liabilities on a loan application should correspond to the properties and mortgages listed on the Schedule of Real Estate Owned. She also knew that the debts on the borrower's credit report reviewed by the lender in determining whether to approve the loan should correspond to the liabilities listed on the loan application.

2.      Accordingly, she formed the following hypothesis: The mortgage liabilities listed in the "Liabilities" section of the loan applications for each of the subjects' Saxeborough and Lost Angel loans correspond to the properties and mortgages listed in the Schedule of Real Estate Owned for that loan.

3.      She then tested that hypothesis: Based on her knowledge, skill, experience, and training as a certified fraud examiner, and in particular as a fraud examiner of mortgage frauds, Ms. Chamberlin expected to see the following for each loan:

_____

[4] In some cases, she observed handwritten notes in the "Liabilities" section of the application and/or on the related credit report reflecting the addresses of the properties listed in the Schedule of Real Estate Owned.

a.   the outstanding balance for each of the mortgage liabilities listed in the "Liabilities" section of the application would correspond to an outstanding mortgage amount set forth for one of the properties listed in the Schedule of Real Estate Owned (hereinafter "SREO");

b.   the amount of the monthly mortgage payment for each mortgage liability listed in the "Liabilities" section of the application would correspond to the amount of the monthly payment set forth for one of the properties listed in the SREO;

c.   the lender's name, account number, outstanding balance, and monthly payment amount set forth for each mortgage liability listed in the "Liabilities" section of the loan application would correspond to a debt on the credit report;

d.   the "high credit balance" and debt "open date" listed on the credit report would correspond to a note and deed of trust pledging the particular property listed on the SREO as collateral.

Ms. Chamberlin examined each loan application and each credit report the government had obtained from the lenders for the subjects' refinancings of Saxeborough and Lost Angel.[5] She noticed that on each application, there were multiple mortgage liabilities listed in the "Liabilities" section of the application, and that there were multiple properties identified by address in the SREO, each of which was described as having an outstanding mortgage. She examined each mortgage liability listed on each loan

---

[5]As the investigation progressed, more loans were identified, and the lenders' records relating to those were provided to Ms. Chamberlin.

application.

Ms. Chamberlin knew, based on her experience and training as a certified fraud examiner, that loan identification numbers, names of the lenders, and payment amounts often change during the life of a mortgage loan. She was aware that lenders typically assign or sell their notes to other lenders, and that they may employ servicing companies to collect monthly payments. She also knew that in such instances, the successor lender or servicer might assign a new identification number to the loan.

In order to keep track of the loan identification numbers, Ms. Chamberlin started to compile a list of the original loan identification numbers and lenders' names. In order to determine the original loan identification numbers, she reviewed items provided by the lenders, (primarily the notes, the deeds of trust, and the HUD-1 Settlement Statements). If she observed that an account number for one of the mortgage liabilities listed in the "Liabilities" section of the application corresponded to an original loan identification number associated with one of the known refinancings for Saxeborough or Lost Angel, she concluded that the listed liability was for that loan, which was collateralized by Saxeborough or Lost Angel, depending on the loan.

If the account number for a mortgage liability listed in the "Liabilities" section of the application did not correspond to an original loan identification number for any of the known refinancings of Saxeborough or Lost Angel, Ms. Chamberlin tried to determine whether the account number for the listed liability was a successive loan identification number for one of the refinancings. To determine the successive loan identification numbers and/or successive lender's and/or servicer's names, Ms. Chamberlin reviewed the lenders' records to find documents (such as payment histories and correspondence with the

7

borrowers) that would identify a successive identification number. If she found documentation provided by the lender for that loan which identified the successive identification number for that loan, Ms. Chamberlin concluded that the liability with the corresponding number related to that loan which was collateralized by Saxeborough or Lost Angel, depending on the loan.  As she linked various successive loan identification numbers to certain refinancings of Saxeborough or Lost Angel, she added that information to the summary of loan identification numbers.  See Attachment 2. Attachment 3 is Ms. Chamberlin's Summary of Loan Codes, codes which she used as a shorthand reference to specific loans.

If there was no documentation of a successive loan identification number in the lender's file for that loan, Ms. Chamberlin employed her specialized knowledge, training, and experience as a certified fraud examiner, and in particular as a certified fraud examiner of mortgage frauds, to look elsewhere for the successive loan identification number. In some cases, she reviewed credit reports appearing in other loan files.

Ms. Chamberlin knew that credit reports contain certain identifying information about the individual's debts.  In particular, for each debt, credit reports typically provide:

1.      Creditor name of the institution reporting the information

2.      Account number associated with the account

3.      Account type (i.e., revolving account, auto loan, real estate loan)

4.      Monthly payment (the minimum amount required to be paid each month)

5.      Date opened (the month and year the account was established)

6.      Balance (the amount owed on the account at the time data was reported)

7.      High balance or high credit (for installment loans, the original loan amount)

8

Based upon Item #5 (Date Opened) and Item #7 (High Balance or High Credit), Ms. Chamberlin was able to identify which of the Saxeborough or Lost Angel loans was listed as a debt on the credit report by referring back to her summary of loan identification numbers and matching the original date and original loan amount to a particular known loan.

If she matched such information, she concluded that the debt on the credit report under the successor name and/or account identification number was for that particular loan, and that the mortgage liability listed in the "Liabilities" section of the application with that account number was for that particular loan.[6]

Ms. Chamberlin observed that the SREOs made it appear as though the mortgage liabilities listed in the "Liabilities" section of the application related to the outstanding mortgages associated with other properties (not Saxeborough or Lost Angel) that were identified in the SREOs.  Ms. Chamberlin concluded that certain liabilities listed in the "Liabilities" section of the subjects' applications  actually corresponded to prior Saxeborough and Lost Angel loans which were not disclosed as outstanding mortgages in the SREOs of those applications.

During this process of identifying liabilities associated with Saxeborough and Lost Angel, Ms. Chamberlin realized that there were still liabilities listed on a number of applications that appeared to correspond to other properties listed on that application's SREO. Ms. Chamberlin was aware of two other properties owned by John Gallegos,

---

[6]Ms. Chamberlin followed this procedure as she examined each of the mortgage liabilities listed in the "Liabilities" section of the loan applications for each of the subjects' refinancings of Saxeborough and Lost Angel.

namely 430 E. 6th Ave., Denver, Colorado and 7603 California Ave. SW, Seattle, Washington, (hereinafter "6th Ave." and "California Ave."). She noticed that those addresses were among the addresses that appeared on the SREOs of various loan applications. She therefore amended her original hypothesis.

4.    Her amended hypothesis was as follows: The mortgage liabilities listed in the "Liabilities" section of the loan applications for the refinancings of Saxeborough and Lost Angel related only to prior mortgages taken by one or more of the subjects for their purchases or refinancings of their Saxeborough, Lost Angel, 6th Ave., and California Ave. properties, and not to the other properties listed on their Schedules of Real Estate Owned.

5.    Ms. Chamberlin then tested the amended hypothesis: Based on her knowledge, skill, experience and training as a certified fraud examiner and what she had learned from testing her first hypothesis, she expected to see that:

a.    the outstanding balance for each of the mortgage liabilities listed in the "Liabilities" section of the application would correspond to an outstanding mortgage balance set forth in the SREO;

b.    the amount of the monthly mortgage payment for each mortgage liability listed in the "Liabilities" section of the application would correspond to the amount of the monthly payment for one of the subjects' outstanding loans for Saxeborough, Lost Angel, 6th Ave., or California Ave.;

c.    the lender's name, account number, outstanding balance, and monthly payment amount set forth for each mortgage liability in the "Liabilities" section of the loan application would correspond to a debt

on the credit report;

    d.    for each of the subjects' mortgages for their purchases and refinancings of Saxeborough, Lost Angel, 6th Avenue, or California Ave., there would be a note and a deed of trust that would confirm the existence of the debt and identify the property pledged as collateral as being Saxeborough, Lost Angel, 6th Avenue, or California Avenue.

Ms. Chamberlin re-examined the loan applications and credit reports, and also focused on the notes and deeds of trust relating to the subjects' loans for the purchases and refinancings of their Saxeborough, Lost Angel, 6th Ave. and California Ave. properties. For each loan application, she compared the information related to each mortgage liability listed in the "Liabilities" section and the information provided in connection with each property listed in the SREO (including properties other than Saxeborough, Lost Angel, 6th Avenue, and California Avenue) to the information on the loans taken by one or more of the subjects against their Saxeborough, Lost Angel, 6th Avenue, and California Ave. properties. She used her summary of the loan identification numbers and lender/servicer names as and aid. Her examination revealed that in most instances:

    a.    the outstanding balances on the mortgage liabilities listed in the "Liabilities" section of the loan applications corresponded to the balances on the loans the subjects had taken to refinance their Saxeborough, Lost Angel, 6th Ave, and California Ave. properties;

    b.    the monthly payment amounts for the mortgage liabilities listed in the "Liabilities" section of the loan applications corresponded to the monthly payment amounts for the prior outstanding mortgages the

11

subjects had obtained for the purchase or refinancing of their Saxeborough, Lost Angel, 6th Ave. and California Ave. properties;

c.     the lenders' names, account numbers, outstanding balances, and monthly payment amounts set forth in the "Liabilities" section of the loan applications corresponded to particular debts on the credit reports in the same loan file; and

d.     taking into account the various changes to the loan numbers, lenders' names, and monthly payment amounts, the mortgage liabilities listed in the "Liabilities" section of the loan applications corresponded to the notes and deeds of trust for the subjects' prior outstanding mortgages on the Saxeborough, Lost Angel, 6th Ave., and California Ave. properties.

Ms. Chamberlin's specific expert opinions which were the product of her application of the methodology described above in Part II and in this Section III A are set forth in Parties' Second Amended Joint Motion Under Fed.R.Evid. 702 (Doc. 160 at 3-63).  By way of example, key documents relating to Ms. Chamberlin's Opinions #A8(a) and #A8(g) appear in Attachment 4 hereto; key documents relating to Opinion #A27(k) appear in Attachment 5 hereto.

**B.     Ms. Chamberlin's Analysis as to Whether the Loan Proceeds from Each Refinancing of Saxeborough and Lost Angel Were Used to Promptly Pay Off the Prior Outstanding Mortgage as Required by the Lender**

1.     <u>Analysis of available data</u>: Based on her knowledge, experience, and training, Ms. Chamberlin knew that the majority of the proceeds for the refinancing of a

mortgage should be used to promptly fund the payoff of the loan being refinanced. Even so, as a result of her above-described analysis of each of the Saxeborough and Lost Angel loan applications and credit reports relating to those applications, she could see that numerous prior loans for Saxeborough, Lost Angel, 6th Ave., and California Ave. appeared to be outstanding long after they should have been paid off. Although many of the mortgage liabilities on the subjects' loan applications appeared to correspond to other properties listed on their Schedule of Real Estate Owned, Ms. Chamberlin had concluded that those liabilities actually corresponded to the subjects' Saxeborough, Lost Angel, 6th Ave., and California Ave. properties. (See Section III A, above).

By examining the HUD-1 Settlement Statements in the lenders' files for the subjects' refinancings of Saxeborough and Lost Angel, she could see that one of the subjects' companies usually served as the settlement agent at the closing. Based on her knowledge, education, training, and experience as a certified fraud examiner, Ms. Chamberlin was aware that the settlement agent at a loan closing typically receives the loan proceeds from the lender in escrow, and is required to disburse those funds as directed by the lender.

In examining the subjects' business bank account records, and in particular the account records of their title and escrow companies,[7] Ms. Chamberlin could see numerous deposits of what appeared to be loan proceeds.  However, she saw very few withdrawals which would be consistent with payoffs following those deposits.

---

[7]Initially, Ms. Chamberlin was aware that one or more of the subjects controlled CCCT and RET. As the investigation progressed, she became aware of other companies one or more of them controlled, including Paradigm Escrow and Title, LLC and Escrow Closing Services, LLC, and others not relevant to this particular analysis.

2.  <u>She formed the following hypothesis:</u> Proceeds of the subjects' loans for their refinancings of Saxeborough and Lost Angel were not used to promptly pay off the prior outstanding mortgages, as required by the lenders.

3.  <u>She then tested the hypothesis:</u> In order to determine whether or not the loan proceeds were used to promptly pay off the prior outstanding mortgage as required by the lender, Ms. Chamberlin had to first determine where the proceeds had been deposited. Ms. Chamberlin expected to see that the proceeds were deposited into a bank account of the entity which served as the settlement agent for the loan (in this case, usually CCCT or RET).

Deposits of the Proceeds

Based on her knowledge, experience, and training as a certified fraud examiner, Ms. Chamberlin knew that the dollar amount of the loan proceeds is neither the dollar amount on the promissory note nor any amount listed on the HUD-1 Settlement Statement. Therefore, to determine where the proceeds were deposited, Ms. Chamberlin had to first identify the specific amount of the loan proceeds.

Based on her knowledge, experience, and training, Ms. Chamberlin also knew that the disbursement of loan proceeds does not always occur on the date of the closing. The lenders' records did not usually identify the amount and date of the disbursement or the bank account into which the proceeds were deposited.  The bank records revealed only pieces of information that helped Ms. Chamberlin identify the loan.

Ms. Chamberlin examined documents the lenders had provided to determine whether any of those documents revealed the amount of the proceeds and to what particular bank account the proceeds were deposited. Although in a few cases, Ms.

14

Chamberlin could rely solely on a document provided by a lender which identified the bank account, the deposit date, and the amount of the proceeds, in most cases the lenders' records did not contain such information. Since Ms. Chamberlin did not have the settlement agents' records, which typically contain that information, she relied on her skills and training as a certified fraud examiner to identify the amount of the proceeds, the date of the deposit of the proceeds, and the specific bank account into which the proceeds had been deposited.

She next examined the bank account records for CCCT and RET. On the account statements, she noticed multiple deposits of what appeared to be proceeds for loans. Since any title or escrow company would be expected to receive loan proceeds on a regular basis, Ms. Chamberlin needed to narrow her review of the deposits in these bank accounts. She did so by concentrating her search around the time of each of the loan closing dates for the subjects' refinancings of their Saxeborough and Lost Angel loans.

She observed that the bank account records for deposits and incoming wire transfers sometimes provided information that identified the loan and/or lender. In some cases, the records identified the lender by name and the loan by the loan identification number. In those cases, Ms. Chamberlin, using her summary of loan identification numbers (Attachment 2) as an aid, concluded that the deposit constituted the proceeds of a particular known loan.

In other cases, the bank account records provided very little, if any, information which would identify the loan. In those cases, she could sometimes conclude that a particular deposit was the loan proceeds for a particular loan based on the following: the date of the deposit was close in time to the date of the loan closing; the amount of the

deposit corresponded to the original loan amount; and her summaries of all of the bank accounts, both personal and business, indicated that no other deposit corresponded to the particular loan proceeds she was reviewing.

For each deposit of funds which appeared to be a deposit of loan proceeds for the subjects' loans into one of the accounts controlled by one or more of the subjects, Ms. Chamberlin followed the same procedure. In this manner, she concluded that not all of the loan proceeds deposited into accounts controlled by the subjects corresponded to their refinancings of Saxeborough and Lost Angel, but that some of the deposits were the proceeds of John Gallegos' refinancings of his California Ave. property.

### Identification of Prior Outstanding Mortgages to be Paid Off

Once Ms. Chamberlin had identified particular deposits as the proceeds of particular known loans, she determined which prior outstanding mortgage the lender had designated to be paid off as a condition of the approval of each loan. She examined the HUD-1 Settlement Statement as well as any payoff statement that may have been provided by the lender associated with that refinancing. She noticed that the HUD-1 Settlement Statement typically only showed the lender of the loan to be paid off and  not the particular loan number.  If the payoff statement provided a loan number which corresponded with a particular loan she had identified,  she concluded that was the loan designated to be paid off with the proceeds of the new loan.

If a payoff statement had not been provided by the lender, Ms. Chamberlin had to use her expertise as a certified fraud examiner to determine which loan the lender had designated to be paid off with the proceeds of the new loan. Based upon her above-described analysis of the loan applications, Ms. Chamberlin was aware that only one

outstanding mortgage for Saxeborough or Lost Angel had been disclosed on the loan application. She therefore reviewed the loan application to determine which outstanding loan for Saxeborough or Lost Angel had been disclosed.  She concluded that the sole outstanding loan for that property which had been disclosed to the lender was the loan that had been designated by the lender as the loan to be paid off with the proceeds of the new loan.

Use of the Proceeds

With the aid of her summaries of bank account transactions, Ms. Chamberlin then examined the withdrawal activity following the deposit of the particular proceeds. In many cases, she observed that the proceeds or portions of the proceeds had been transferred to other accounts over which one or more of the subjects had control. She then examined the withdrawal activity in that account or accounts to determine whether the proceeds had been used to pay off any prior outstanding mortgage, and in particular, the prior outstanding mortgage designated by the lender to be paid off as a condition of the approval of the loan.

To determine if the proceeds thus traced were used to pay off a particular loan, Ms. Chamberlin analyzed her bank account summaries to see whether there was a large withdrawal which would correspond to the loan designated as the loan to be paid off following the deposit of proceeds for a particular loan.

Ms. Chamberlin concluded that in all but one instance, the proceeds from the loans for Saxeborough and Lost Angel were not used to pay off the prior outstanding mortgage designated by the lender to be paid off as a condition of the approval of the loan. Ms. Chamberlin also concluded that on some occasions, the loan proceeds were used to pay

off a prior outstanding mortgage other than the one designated by the lender to be paid off as a condition of the approval of the loan.

Her specific opinions that the proceeds of certain loans were deposited into certain bank accounts on certain dates, and her specific opinions as to whether those particular proceeds were used to pay off the prior mortgages designated by the lender to be paid off as a condition of the approval of the loan, all of which are the product of her application of the methodology described above in Part II and this Section III B, are set forth in the Parties' Second Amended Joint Motion Under Fed.R.Evid. 702 (Doc. 160 at 64-78). By way of example, key documents relating to Ms. Chamberlin's Opinions #B14(a) and #B14(b) appear in Attachment 6 hereto.

**C.    Ms. Chamberlin's Analysis as to Whether Monthly Payments Were Made from Accounts Controlled by One or More of the Subjects for Each Loan Listed as an Outstanding Mortgage Liability in the "Liabilities" Section of the Loan Applications for the Refinancings of Saxeborough and Lost Angel.**

I.    <u>Analysis of available data</u>:  As  Ms. Chamberlin was analyzing the Liabilities and Schedule of Real Estate Owned sections of the subjects' loan applications, she observed that there were outstanding mortgage loans listed as liabilities.  Her analysis of those applications led her to conclude that those outstanding mortgages did not relate to the properties listed on the subjects' Schedules of Real Estate Owned, but rather to their prior outstanding mortgages on their Saxeborough, Lost Angel, 6th Ave., and California Ave. properties.   (See Section III A, above).

In reviewing the subjects' bank account records, Ms. Chamberlin observed that in many of the accounts, there were multiple payments to various lending institutions which appeared to be monthly payments to mortgage lenders.  In reviewing the lenders' records,

she knew that some payments had been made on particular loans. In addition, Ms. Chamberlin's analysis of whether the loan proceeds were used to pay off the outstanding mortgages had led her to conclude that proceeds of the loans had been deposited to bank accounts controlled by the subjects, but that those funds, for the most part, had not been used to pay off the outstanding mortgage being refinanced. (See Section III B, above).

II.     The hypothesis: For each of the loans for Saxeborough, Lost Angel, 6th Avenue and California Ave., monthly mortgage payments were made with funds held in accounts over which one or more of the subjects had control.

III.     Testing the hypothesis: Ms. Chamberlin compared the lenders' payment records to the subjects' bank account records to see if she could identify a bank withdrawal which corresponded to the payment received. The bank records did not usually readily identify to which loan a payment had been made, and the lenders' records rarely identified the bank account from which the payment had been made.  The lenders did not always provide complete payment records, if any.

As a result, Ms. Chamberlin could not usually readily identify from her examination of the bank records, which loans were associated with which payments. Similarly, from her examination of the lenders' records alone, she could rarely identify which bank account was associated with which payment.

To test her hypothesis, Ms. Chamberlin looked first to determine whether the lender had provided a payment history. If it had, she reviewed all of her bank account summaries to identify the related payments. She examined the dates of the payments, the amounts of the payments, the payees, and any original and successive loan identification numbers set forth in the payment histories and the bank records. Where the information from the

payment history corresponded to the information from the bank records relating to a particular withdrawal, she concluded that the withdrawal was a payment on the loan for which the payment history had been provided.

If the lender had not provided a payment history, Ms. Chamberlin reviewed the bank records for withdrawals which referenced a loan identification number, were payable to a lender, and occurred monthly. If she found such a withdrawal, she reviewed her loan identification number summary to see if she had previously linked that identification number to a particular loan. If she had, she concluded that the withdrawal was a payment that had been made on that loan.

In some instances, where a payment history was not provided by the lender and the bank record did not provide the loan identification number, Ms. Chamberlin  looked elsewhere to find information which would link the withdrawal to a specific loan.  For example, in some instances, she compared the date and amount of the withdrawal in the bank records to the initial monthly payment for the loan and first payment due date as set forth in the promissory note or other initial payment documentation prepared for the loan closing.  Where this information linked the payment to the loan,  she concluded that the withdrawal was a payment on that loan.  If she saw that the same amount was withdrawn from a bank account the next month, she concluded that the withdrawal was a payment on that loan.  Ms. Chamberlin continued to identify each monthly payment for each loan in a similar fashion.

Ms. Chamberlin also reviewed records from Speedpay, an electronic bill-paying service.  Speedpay provided documentation as to some payments on some loans.  The Speedpay documents included information which identified the loans by lender name, loan

identification number, approximate date the payment would have been withdrawn from the bank account, the bank account number from which payment was withdrawn, and the amount of the payment (plus any processing fees).  This information helped confirm Ms. Chamberlin's conclusions regarding some of the monthly mortgage payments on some of the loans.

As a result of this analysis, Ms. Chamberlin concluded that for a period of years, specific monthly mortgage payments had been made with funds from fifteen of the subjects' personal and business accounts on specific loans which should have been paid off previously through refinancing. No one account was used exclusively to make the payments on a particular loan, and most of the accounts were used to make payments on several loans.  Each of Ms. Chamberlin's opinions as to which bank account was used to fund each mortgage payment on the fifty-eight loans which were the subject of her analysis is listed in the Parties' Second Amended Joint Motion Under Fed.R.Evid. 702 (Doc. 160 at 79-123).   These opinions were the product of her application of the methodology described in Part II above and this Section III C. By way of example, key documents relating to Ms. Chamberlin's Opinion #C1088 appear in Attachment 7 hereto; key documents relating to her Opinion #C1389 appear at Attachment 8 hereto.

## IV. <u>Memorandum of Law</u>

**A.    Introduction**

Federal Rule of Evidence 702 requires that a proffered expert be qualified "by knowledge, skill, experience, training, or education" to render her opinion, and that the opinion assist "the trier of fact to understand the evidence or to determine a fact in issue."

This rule also requires that "(1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. "In the 10th Circuit, the Rule 702 analysis has two steps: first, the Court determines whether the expert is qualified to render the proffered opinion, and second, the Court examines whether the opinion itself is reliable." *United States v. Crabbe,* 556 F. Supp. 2d 1217, 1221 (D. Colo. 2008) (citing *103 Investors I, L.P. v. Square D Co.,* 470 F.3d 985, 990 (10th Cir. 2006)); *see Kuhmo Tire Company, LTD., v. Carmichael,* 526 U.S. 137, 156-57 (1999) (the Court is to "decide whether [the proffered] expert had sufficient specialized knowledge to assist the jurors 'in deciding the particular issues in the case'" and whether the "principles and methods employed" by that expert "have been properly applied to the facts of the case") (citations omitted).

The party offering the expert testimony has the burden of "establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." *United States v. Nacchio*, 555 F.3d 1234, 1251 (10th Cir. 2009) (citation omitted). The proponent is not required to prove that the opinion is objectively correct, but rather, "only that the witness has sufficient expertise to choose and apply a methodology, that the methodology applied was reliable, that sufficient facts and data as required by the methodology were used and that the methodology was otherwise reliably applied." *Crabbe,* 556 F. Supp. 2d. at 1221 (citations omitted).

**B.      Non-Scientific Expert**

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589 (1993),

the Supreme Court focused on the admissibility of scientific expert testimony and set forth the district court's gatekeeping obligation to determine that such testimony "both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597. In *Kuhmo Tire*, the Supreme Court determined that *Daubert* also applies to testimony based on "technical" and "other specialized" knowledge. *Kuhmo Tire,* 526 U.S. at 141. In non-scientific cases, "the relevant reliability concerns may focus upon personal knowledge or experience" of the proffered expert. *Kuhmo Tire,* 526 U.S. at 150. The Court pointed out that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Id.* at 156; *see also Crabbe,* 556 F. Supp. 2d at 1222 (Rule 702 is not limited to scientific opinions "but instead, is an inquiry into whether the methodology is a scientific or logical method that can be replicated and validated") (citing *Kuhmo Tire,* 526 U.S. at 152)). Federal Rules of Evidence 702 and 703 provide expert witnesses testimonial latitude based on the "assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Daubert,* 509 U.S. at 592.

## C.    Certified Fraud Examiner and Certified Public Accountant Dana Chamberlin

Ms. Chamberlin is a Certified Fraud Examiner (CFE) and Certified Public Account (CPA). Ms. Chamberlin has been a CFE for thirteen years and a CPA for over twenty-one years. For the last twenty years, Ms. Chamberlin has worked as a financial analyst with the FBI and as an auditor with the United States Attorney's Office. In those capacities, she has focused on the analysis of various topics which arise in wire fraud, mail fraud, bank fraud, mortgage fraud, securities fraud, and money laundering investigations. The United States seeks to introduce the expert opinions reached by Ms. Chamberlin in analyzing

certain aspects of the evidence in this case. Individuals with credentials such as Ms. Chamberlin's have routinely been allowed to offer expert opinions. *United States v. Cantwell,* 41 Fed. App'x 263, 269-70 (10th Cir. May 15, 2002) (district court did not abuse its discretion in allowing CFE as an expert to testify about pyramid schemes and their characteristics); *Lindley v. Lindley,* Nos. 92-6067, 92-6081, 1993 WL 279764, at *2 (10th Cir. July 19, 1993) (rejecting defendant's challenge to the qualifications of plaintiff's expert witness who was a CPA and CFE with extensive experience in fraud investigation).

**D.    Methodology**

Consideration of a proposed expert's methodology entails two inquiries: "(I) what methodology did the witness use to reach the opinion; and (ii) is that methodology generally deemed 'reliable' in the field in which the expert works." *Crabbe,* 556 F. Supp. 2d at 1222. The methodology used by Ms. Chamberlin is described above.

In determining whether a proposed expert's testimony is reliable, *Daubert* identified a number of factors that the district court may consider, which factors are geared more toward scientific testimony.[8] *Daubert* made clear that these factors do not constitute a "definitive checklist or test," but rather must be tied to the facts of a particular case. *Daubert,* 509 U.S. at 591-93. Accordingly, the Court in *Kuhmo Tire* held that "[t]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." 526

---

[8] These factors include 1) whether a "theory or technique . . . can be (and has been) tested"; 2) whether it "has been subjected to peer review and publication"; 3) whether, in respect to a particular technique, there is a high "known or potential rate of error" and whether there are 'standards controlling the technique's operation' and 4) whether the theory or technique enjoys "general acceptance" within a "relevant scientific community." *Daubert,* 509 U.S. at 592-94.

U.S. at 150 (citation omitted).  The district court is granted "broad latitude to determine" whether *Daubert's* specific factors "are or are not reasonable measures of reliability in a particular case."  *Id.* at 153.

"[I]t is the specific relation between an expert's method, the proffered conclusions, and the particular factual circumstances of the dispute, and not asymptotic perfection, that renders testimony both reliable and relevant."  *Bitler v. A.O. Smith Corp.,* 400 F.3d 1227, 1233-34 (10th Cir. 2004).  Indeed, "a methodology that does not enjoy peer review or testing may nevertheless be reliable simply because it constitutes a generally-accepted practice in the discipline."  *Crabbe,* 556 F. Supp. 2d at 1223 (citing *Bitler,* 400 F.3d at 1235).  The inquiry is whether "the methodology is a scientific or logical method that can be replicated and validated."  *Crabbe,* 556 F. Supp. 2d at 1222; *see also Orth v. Emerson Electric Co.,* 980 F.2d 632, 637 (10th Cir. 1992) (pre-*Daubert* opinion holding that "as long as a logical basis exists for an expert's opinion . . . the weaknesses in the underpinnings of the opinion[ ] go to the weight and not the admissibility of the testimony") (citation omitted); *Werth v. Makita Electric Works, LTD.,* 950 F.2d 643, 651-52 (10th Cir. 1991) (pre-*Daubert* opinion holding the same).  "Once a court is satisfied that the methodology is generally reliable, suggestions that the witness should have engaged in additional testing to achieve certainty in his or her conclusions are matters going to the weight of the opinion, not its admissibility."  *Crabbe,* 556 F. Supp. 2d at 1223 (citing *Bitler,* 400 F.3d at 1236 & n.2).

In addressing non-scientific disciplines where the opinion addresses "a factual issue of consequence to the legal regime underlying a claim or defense, where the use of

professional judgment may produce a broad range of acceptable opinions, so long as the expert possesses at least one of the qualifying attributes listed in Rule 702 (specialized knowledge, skill, education, experience or training), has employed a methodology recognized in the profession or by the courts, and can identify the source of the facts and data underlying the opinion (demonstrating a connection of the opinion to the facts of the case), a probing cross-examination and presentation of opposing experts and evidence will permit the fact-finder to judge the soundness of the expert's judgment, as well as the expert's credibility and potential bias, in order to assess how much weight to accord the expert's opinion."  *In re Commercial Financial Services, Inc. v. Chase Manhattan Bank USA, N.A.,* 350 B.R. 520, 528-29 (N.D. Ok. 2005).

Finally, the proponent of the expert opinion must show that the witness gathered "sufficient facts and data" to formulate the opinion, and that she "reliably applied the methodology" to those facts and data.  *Crabbe,* 556 F. Supp. 2d at 1223.

### E.      Relevance

The district court must also determine whether the proposed testimony is "relevant to the task at hand."  *Daubert,* 509 U.S. at 597.  The Court in *Daubert* described consideration of relevant evidence as one of "fit."  *Id.* at 591 (citation omitted).  In making this determination, the Court "must look at the logical relationship between the evidence proffered and the material issue that evidence is supposed to support to determine if it advances the purpose of aiding the trier of fact."  *Bitler,* 400 F.3d at 1234.

### F.      Lay Versus Expert Testimony

Lay testimony is not permitted as to matters "which are beyond the realm of

common experience and which require the special skill and knowledge of an expert witness." *James River Ins. Co. v. Rapid Funding, LLC.*, 658 F.3d 1207, 1214 (10th Cir. 2011) (citation omitted); *see id.* at 1214 ("a person may testify as a lay witness only if his opinions or inferences do not require any specialized knowledge and could be reached by any ordinary person"); *United States v. Mejia*, 545 F.3d 179, 194 (2nd Cir. 2008) ("[t]estimony is properly characterized as 'expert' only if it concerns matters that the average juror is not capable of understanding on his or her own"). "[K]nowledge derived from previous professional experience falls squarely within the scope of Rule 702 and thus by definition outside of Rule 701." *James River,* 658 F.3d at 1215 (citation omitted).

In *Mejia,* an investigator with the New York State Police Department was qualified as an expert to testify, *inter alia,* about the background, structure and activities of the MS-13 gang. Defendants argued that several portions of the law enforcement officer's testimony were outside the scope of expert testimony because that testimony was readily understandable by the jurors. 545 F.3d at 194-95. The officer testified, among other things, to the number of firearms and ammunition seized by the FBI from the MS-13 gang, that members of the gang had been arrested on Long Island for dealing narcotics, and that the gang had committed between 18 and 23 murders between June 2000 and the trial. *Id.* at 194-95. On appeal, the Second Circuit held that no expertise was "required to understand any of these facts. Had the government introduced lay witness testimony, arrest records, death certificates, and other competent evidence of these highly specific facts, the jury could have 'intelligently' interpreted and understood it." *Id.* at 195. The Court noted that "[e]xpert testimony might have been helpful in establishing *the relationship*

between these facts and MS-13, but it was not helpful *in establishing the facts themselves*." *Id.* (emphasis added).

In the instant case the government intends to offer the expert opinions of Ms. Chamberlin as to (1) the inter-relationships among certain liabilities listed on the defendants' loan applications, certain information provided in the Schedules of Real Estate Owned on those applications, mortgage liabilities listed on the credit reports used in the application process for those loans, and the defendants' prior mortgages; (2) whether the loan proceeds from particular loans were used to promptly pay off particular prior outstanding mortgages as required by the lenders; and (3) the linkage between specific monthly payments made from accounts controlled by one or more of the defendants to the loans listed as outstanding mortgage liabilities on their loan applications, most if not all of which should have previously been paid off through refinancing.

Ms. Chamberlin's testimony will not be offered as a short-cut to establishing the underlying facts, as was the witness' testimony in *Mejia*. Ms. Chamberlin formed her opinions by "applying [her] extensive experience and a reliable methodology" to the evidence. *Mejia,* 545 F.3d at 197. The source of Ms. Chamberlin's opinions has been clearly set forth in discovery, and her opinions are the result of her "synthesis of [these] various source materials." *Id.*

Unlike *Mejia,* the government will not attempt to "substitute expert testimony for factual evidence" of the loan transactions "in the first instance." 545 F.3d at 195. Adhering to the holding of *Mejia,* Ms. Chamberlin will "explain how [she] had pieced together bits of information from different sources and reached a studied conclusion" pertaining to the

mortgage loans at issue in this case. *Id.* at 197-198. This expert testimony will be necessary to show meaningful connections among many pieces of evidence, and addresses topics beyond the ken of average juror. Unlike the witness in *Mejia*, Ms. Chamberlin will not be merely repeating the contents of the source materials she reviewed she will explain how she analyzed their contents in order to be able to identify meaningful connections of materials obtained from different sources. See id. at 198. As stated in Parts II and III above, Ms. Chamberlin will be "applying [her] extensive experience and a reliable methodology" to the evidence. *See id.* at 197; *United States v. Christian,* 673 F.3d 702, 710 (7th Cir. 2012) ("the government wasn't merely seeking lay opinion testimony [from Agent Manns]; the government was asking Agent Manns to bring his experience to bear on his personal observations and 'mak[e] connections for the jury based on that specialized knowledge") (citation omitted)

The Second Circuit held that the law enforcement officer's testimony in *Mejia* violated *Crawford v. Washington,* 541 U.S. 36 (2004) in that much of his testimony "involved merely repeating information he had read or heard." *Mejia,* 545 F.3d at 197. In expressing her opinions, Ms. Chamberlin will not be merely repeating information she has read or heard. She will be "applying [her] training and experience to the sources before [her] and reaching an independent judgment", such that there will be no *Crawford* problem. *United States v. Johnson,* 587 F.3d 625, 635 (4th Cir. 2009). Each of her expert opinions will be "an original product that can be tested through cross-examination." *Id.*

While *Mejia* involved the admission of expert testimony which as presented was lay testimony, the opposite occurred in *James River.* There, the defendant sought to introduce

expert testimony from Andrew Miller as to the value of a building destroyed by fire.  The district court ruled that Mr. Miller's proposed testimony did not meet the requirements of Rule 702, however, it allowed Mr. Miller to offer his lay opinion as to the building's valuation.  *James River,* 658 F.3d at 1211.  The Tenth Circuit held that the district court erred in permitting Mr. Miller to offer his opinions as to the value of the property as lay opinions:  "Mr. Miller's valuation testimony was expert opinion based on technical or specialized knowledge and therefore inadmissible under Rule 701(c)."  *Id.* at 1214.  The Tenth Circuit further held that the error was not harmless and therefore reversed the verdict.  *Id.* at 1219-22.

## V. <u>Conclusion</u>

For the reasons set forth above, and based on the evidence and argument the government will present at the Rule 702 hearing in this matter, the United States submits that it will establish the Fed.R.Evid. 702 foundational prerequisites for the admission of Ms. Chamberlin's opinion testimony.

Respectfully submitted this 17th  day of October, 2012.

JOHN F. WALSH
United States Attorney


By: *s/ Linda Kaufman*
Linda Kaufman
Assistant United States Attorney
1225 Seventeenth Street, Suite 700
Denver, Colorado 80202
Telephone: (303) 454-0100
Facsimile: (303) 454-0404
E-mail: Linda.Kaufman@usdoj.gov

By: *s/ Martha Paluch*
Martha Paluch
Assistant United States Attorney
1225 Seventeenth Street, Suite 700
Denver, Colorado 80202
Telephone: (303) 454-0100
Facsimile: (303) 454-0404
E-mail: Martha.Paluch@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on this 17th day of October, 2012, I electronically filed the foregoing **GOVERNMENT'S PROFFER RELATING TO THE METHODOLOGY USED BY WITNESS DANA CHAMBERLIN AND MEMORANDUM OF LAW** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Martin Adam Stuart
E-mail: martinstuartlaw@solucian.com

Darlene Ann Bagley
E-mail: bagley@ridleylaw.com

William Lewis Taylor
E-mail: wltaylorpc@gmail.com

Paula M. Ray
E-mail: paulamray@earthlnk.net


By: *s/ Solange Reigel*

SOLANGE REIGEL

Legal Assistant to AUSA Linda Kaufman

United States Attorney's Office

1225 - 17th Street, Suite 700

Denver, CO 80202

Telephone: (303) 454-0244

Fax: (303) 454-0402

E-mail: solange.reigel@usdoj.gov