# Fraud Examiners Manual

*2012 US Edition*



**Select a section below to view its chapters:**

- Main Table of Contents
- Preface and Introduction
- Financial Transactions & Fraud Schemes
- Law
- Investigation
- Fraud Prevention & Deterrence
- Copyright and Bibliography

SEARCH



ATTACHMENT 1

# INTRODUCTION

The examiner's attitude toward others affects their attitude toward him. A hostile attitude will create anxiety in the respondents, thereby causing them to become withdrawn and protective, even if there is no reason to do so. Contrary to lore, the successful investigator is rarely "tough," except when the need arises and toughness has been carefully planned and evaluated.

Art Buckwalter says, "The secret is for each private investigator to be the kind of person others will want to deal with." Examiners who mislead others will often themselves be misled. For each guilty person an examiner encounters, he will deal with many innocent witnesses. Those innocent witnesses, and the examiner's ability to draw them out, are indispensable to fraud examination methodology. Because an examiner deals with people from all walks of life, being able to establish rapport with strangers is vital.

Because no two people are alike, the fraud examiner must be able to communicate in the respondent's language. A college graduate will not be questioned exactly the same way as a ninth-grade dropout; someone with a technical vocabulary won't respond in the same manner as a person with an artistic background. As each case differs, so will the examiner's approach.

The fraud examiner must have the technical ability to understand financial concepts, and the ability to draw inferences from them. A unique feature of fraud cases is that, unlike traditional property crimes, the perpetrator's identity usually is known. In a bank robbery, for example, the issue is not whether a crime was committed, but rather who committed the crime. In fraud cases, the issue usually is not the identity of the culprit, but whether or not the conduct constitutes fraud.

It is important that the examiner be able to simplify financial concepts so that others comprehend them. Fraud cases often involve issues that appear complicated, but in reality most fraud is rather simple; the concealment methods make it appear complex.

### Fraud Examination Methodology

Fraud examination methodology requires that all fraud allegations be handled in a uniform, legal fashion and be resolved on a timely basis. Assuming there is sufficient reason (predication) to conduct a fraud examination, specific examination steps usually are employed. At each step of the fraud examination process, the evidence obtained and the

# INTRODUCTION

fraud theory approach continually is assessed. That is to say, the suspect (subject) of the inquiry typically would be interviewed last, only after the fraud examiner has obtained enough general and specific information to address the allegations adequately.

The fraud examination methodology gathers evidence from the general to the specific. Because of the legal ramifications of fraud examiners' actions, the rights of all individuals must be observed throughout.

## Predication

Investigation of fraud consists of the multitude of steps necessary to resolve allegations of fraud—interviewing witnesses, assembling evidence, writing reports, and dealing with prosecutors and the courts. The investigation of fraud, because it deals with the individual rights of others, must be conducted only with adequate cause or predication.

*Predication* is the totality of circumstances that would lead a reasonable, professionally trained, and prudent individual to believe a fraud has occurred, is occurring, and/or will occur. Predication is the basis upon which an examination is commenced. Fraud examinations should not be conducted without proper predication.

## Fraud Theory Approach

*Each fraud examination begins with the proposition that all cases will end in litigation.* To solve a fraud without complete evidence, the examiner must make certain assumptions. This is not unlike the scientist who postulates a theory based on observation and then tests it. In the case of complex fraud, fraud theory is almost indispensable. Fraud theory begins with the assumption, based on the known facts, of what might have occurred. Then that assumption is tested to determine whether it is provable. The fraud theory approach involves the following steps, in the order of their occurrence:
- Analyze available data
- Create a hypothesis
- Test the hypothesis
- Refine and amend the hypothesis

A case study on internal fraud that is based on an actual incident, and one that is common in the commercial and governmental environment, illustrates the concepts involved in the fraud examination process. The names and certain other facts have been changed for purposes of illustration.

# INTRODUCTION

*LINDA REED COLLINS CASE STUDY*

*Linda Reed Collins is purchasing manager for Bailey Books Incorporated in St. Augustine, Florida. Bailey, with $226 million in annual sales, is one of the country's leading producers of textbooks for the college and university market as well as technical manuals for the medical and dental professions.*

*Bailey's headquarters consists of 126 employees, plus numerous sales personnel in the field. Because of the competitive nature of the textbook business, their profit margins are quite thin. Bailey's purchases average about $75 million annually, consisting mostly of paper stock and covering used in the manufacturing process. The great majority of the manufacturing is done in Mexico through contracts with the Mexican government.*

*The purchasing function is principally handled by three purchasing agents. Linda Reed Collins is the purchasing manager and has two other buyers who report to her, plus another 18 clerical and support personnel.*

*Because Bailey Books is required by investors and lenders to have audited annual financial statements, Bailey employs a large regional CPA firm to conduct its annual audit, and has a staff of five internal auditors. All internal fraud matters within the company are referred to Loren D. Bridges, a Certified Fraud Examiner. The typical internal frauds at Bailey involve defalcations by their cashiers, as well as a constant stream of complaints concerning alleged fraud by Bailey Books' salespeople and distributors.*

*On January 28, Bridges was referred a telephone call. The male caller advised that he did not wish to disclose his identity. However, he claimed to have been a "long-term" supplier to Bailey in the area of books and sundries, and magazines. The caller said that ever since Linda Collins took over as purchasing manager for Bailey several years ago, he has been systematically "squeezed out" of doing business with Bailey. Although Bridges queried the caller for additional information, the person hung up the telephone.*

There could be many legitimate reasons why a vendor would feel unfairly treated. To use the fraud theory approach, the Certified Fraud Examiner, in this case Bridges, must analyze the available data before coming to any preliminary hypothesis as to what has occurred.

# INTRODUCTION

## *Analyzing Available Data*

If an audit of the entire purchasing function is deemed warranted, it would be conducted at this time and would specifically keep in mind the possibility of fraud resulting from the anonymous allegation.

## *Creating a Hypothesis*

The hypothesis is invariably a "worst-case" scenario. That is, based on the allegation, what is the worst possible outcome? In this case, for Bailey Books, it would be that one of its purchasing agents was accepting kickbacks to steer business to a particular vendor. A hypothesis can be created for any specific allegation, i.e., a bribery or kickback scheme, embezzlement, conflict of interest, financial statement fraud, etc. In furtherance of the hypotheses, fraud examiners know that each specific scheme has its own unique characteristics that constitute the badges or "red flags" of fraud.

## *Testing the Hypothesis*

Testing a hypothesis involves creating a "what-if" scenario. If, as part of the hypothesis, a bribery of a purchasing agent existed, the fraud examiner likely would find some or all of the following facts:
- A personal relationship between the buyer and vendor
- Ability of the purchasing agent to steer business toward a favored vendor
- Higher prices and/or lower quality for the product or service being purchased
- Excessive spending by the purchasing agent

In the hypothetical case of Linda Reed Collins, the Certified Fraud Examiner—using Bailey Books' own records—can readily establish whether or not one vendor is receiving a larger proportional share of the business than similar vendors. Bridges could ascertain whether or not Bailey Books was paying too much for a particular product, such as paper, by simply calling other vendors and determining competitive pricing. A personal relationship with any suspected vendor and the buyer could be confirmed by discreet observation or inquiry. Whether or not a particular purchasing agent had the ability to steer business toward a favored vendor could be determined by reviewing the company's internal controls to ascertain who is involved in the decision-making process. The purchasing agent's lifestyle could be discreetly determined through examination of public documents such as real estate records and vehicle titles.

### *Refining and Amending the Hypothesis*

In testing the hypothesis, the fraud examiner might find that all facts do not fit a particular scenario. If such is the case, the hypothesis should be revised and retested. (Obviously, if the known facts are tested with negative results, it could be that a fraud is not present, or it could indicate that the fraud cannot be proved.) In the Linda Reed Collins example, a discreet inquiry might determine that Collins did not have an excessive lifestyle but rather significant personal indebtedness. The fraud theory could then be appropriately revised.

Following is a flow chart setting forth how the fraud examination process is used to resolve allegations.

# INTRODUCTION



# INTRODUCTION





**Develop fraud theory:**
- Who might be involved?
- What might have happened?
- Why might the allegation be true?
- Where are the possible concealment places or methods?
- When did this take place (past, present, or future)?
- How is the fraud being perpetrated?

**Determine where the evidence is likely to be:**
- On-book vs. Off-book
- Direct or circumstantial
- Identify potential witnesses

**What evidence is necessary to prove intent?**
- Number of occurrences
- Other areas of impropriety
- Witnesses

**Revise fraud theory**

**Prepare chart linking people and evidence**

**Determine defenses to allegations**

Is evidence sufficent to proceed? → No → Discontinue

Yes ↓

Complete the investigation through:
*Interviews*
*Document Examination*
*Observations*

# INTRODUCTION

### The Fraud Examiner's Tool Kit

Essentially three tools are available to the fraud examiner regardless of the nature of the fraud examination. First is interviewing, which is the process of obtaining relevant information about the matter from those with knowledge of it. For example, in developing information about Linda Reed Collins, it might be necessary to interview her co-workers, superiors, and subordinates.

Second, the fraud examiner must be skilled in the examination of financial statements, books and records, and supporting documents. The examiner must know the legal ramifications of evidence and how to maintain the chain of custody over documents. For example, checks and other financial records to prove the case must be lawfully obtained, analyzed, and conclusions must be drawn, if it is determined that Linda Reed Collins was taking payoffs from a supplier.

Finally, fraud examiners are often placed in a position where they must observe behavior, search for displays of wealth, and in some instances, observe specific offenses. A Certified Fraud Examiner, for example, might recommend a video surveillance of a company's cashiers department to witness a defalcation being committed. Or, the fraud examiner might establish a visual surveillance in a public place to determine the patterns or activities of the subject.

### Interviewing

If it appears that the fraud theory is still applicable after the fraud examiner analyzes the documents, the examiner proceeds to the next step: interviews of neutral third-party witnesses.

### *Neutral Third-Party Witnesses*

A neutral third-party witness is a person not involved in a specific instance of fraud. For example, if the fraud examination of Linda Reed Collins progressed past the stage of analyzing documents, it would be common for the fraud examiner to interview the personnel officer at Bailey Books Incorporated regarding Collins' personnel file.

### *Corroborative Witnesses*

Corroborative witnesses are those who can corroborate facts relating to a specific offense. These witnesses might be cooperative or uncooperative, but they are not directly related to the offense involved. Collins' co-workers or subordinates at Bailey Books Inc. could be

# INTRODUCTION

corroborative witnesses. Interviews with witnesses to corroborate facts should be done after interviewing neutral third-party witnesses.

### *Co-Conspirators*

If after examining documents, neutral third-party witnesses, and corroborative witnesses, it still appears that further work is warranted, the fraud examiner typically would interview co-conspirators to the alleged offense. In the case of Linda Reed Collins, if it were determined that a vendor was paying Collins kickbacks, that vendor typically would be interviewed prior to contacting Collins. People suspected of complicity generally are interviewed in the order of those thought to be least culpable to those thought to be most culpable. In criminal prosecutions, law enforcement officers and prosecutors can sometimes promise leniency to co-conspirators in return for their cooperation. These individuals are called "inside witnesses" and will be discussed in detail later. Such promises by private sector fraud examiners are not permitted, and might legally invalidate any admissions that are made.

### *Subject*

In general, the subject (also called the suspect or accused) is interviewed last, after all facts necessary to resolve the allegation are obtained. Even if it is felt that the subject will not offer a confession, an interview is usually scheduled; in many instances it can be used later for impeachment. An interview might also give the examiner a good idea of what defenses the subject might raise.

### Purpose of the Fraud Examination

The purpose of the fraud examination is to prove or disprove the legal elements of the offense. Each and every element must be proven (1) beyond a reasonable doubt in criminal cases, and (2) by a preponderance of the evidence in civil cases. To do this, it is necessary to understand certain objectives common to white-collar cases. Because investigations of fraud often involve an extensive array of information, the fraud examiner can lose sight of the objectives. According to Herbert Edelhertz:

> *One of the characteristics that most distinguishes the investigation of white-collar crime from that of common crimes is the necessity for the investigator to establish the intent and underlying motives of the subject by placing together jigsaw puzzle pieces of apparently legitimate activities to add up to a picture of illegitimacy—rather than by a simple showing of one event which by itself flatly demonstrates wrongful intent.*

# INTRODUCTION

### Elements of White-Collar Offenses

While it is not possible or necessary to list every variation of white-collar crime and fraud, all have common elements, such as:
- Intent—knowingly to commit a wrongful act or to achieve a purpose inconsistent with law or public policy
- Disguise of purpose—falsities and misrepresentations employed to accomplish the scheme
- Reliance—by the offender on the ignorance or carelessness of the victim
- Voluntary victim action—to assist the offender
- Concealment—of the offense

### *Intent*

Intent must be shown in fraud matters. Intent rarely is self-evident, but must rather be demonstrated by showing a pattern of activity. Some of the more common ways to show intent include proof that the accused:
- Had no legitimate motive for the activities
- Repeatedly engaged in the same or similar activity of an apparent wrongful nature
- Made conflicting statements
- Made admissions
- Acted to impede the investigation of the offense
- Made statements the offender clearly knew to be false

### *Disguise and Misrepresentation*

Misrepresentation usually is shown by the facts that the representation was made and that it was false, either by omission or commission.

### *Voluntary Victim Action to Assist the Offender*

Proof that the victim assisted the offender usually is not difficult to obtain from the victim. It is important for the fraud examiner to ascertain the exact circumstances regarding the fraud from the victim, clearly drawing out what made the fraud possible. In the case of employee thefts, for example, the victim (the company) entrusted the care of assets to the subject. That fiduciary capacity must be established.

### *Concealment*

Concealment is a cornerstone of fraud. As opposed to traditional crimes, where there is no effort to conceal, fraud perpetrators take steps to keep the victim ignorant. Acts in fraud

schemes designed to conceal include committing offenses too small to be recognized as fraud by the victim. In embezzlement cases, for example, the amount of money taken at any one time usually is small relative to the total company assets. By demonstrating a continuing pattern of thefts, the concealment aspect can be shown.

To hide their actions, fraud perpetrators often create complex financial trails. The more obscure the act, the greater likelihood that it will not be detected. Some fraud cases involve fraudulent invoices and journal entries. Concealment in these types of cases often can be proven by the fact that the entries made had no purpose other than to conceal.

### Proof Stages in Fraud Cases

Proof in most complex white-collar cases usually proceeds through three basic stages. First, the fraud examiner builds the circumstantial case through interviews of cooperative witnesses and review of available documentation. Then the examiner uses the circumstantial evidence to identify and persuade an inside witness who can provide direct evidence against the defendant. Then the case is sealed, defenses are identified and rebutted, and intent is proved through examination of the subject.

**Stage One: Building the Circumstantial Case**

As used here, *circumstantial evidence* means all proof other than direct proof of wrongdoing. In a fraud case, it is the proof of the defendant's representations, evidence of their falsity and intent. In a corruption case, it is evidence of the standard behavior, the defendant's breach, and the illegal payments. The circumstantial case also might include "similar act evidence" to show a common scheme or plan, lack of mistake or accident, *modus operandi*, and most commonly, intent.

Circumstantial evidence might be all that is available. It must be complete with no gaps, consistent (tending to prove a single point), and must exclude all explanations other than guilt. Collecting this type of evidence can be very difficult. Many complex cases lose direction during the circumstantial stage when the examiner becomes overwhelmed by the mass of accumulated detail and documents. To avoid getting bogged down, consider the following:

# INTRODUCTION

*Keep an Eye on the Ball*

Examiners must remember the importance of the fraud theory and keep in mind exactly what they are attempting to prove at all times. If examiners lose track of the objective, they should review and reorganize the evidence, develop an alternate theory, and refocus efforts. The examiner always is trying to prove or disprove something—even if merely a hunch—but never merely collecting information.

*Simplify the Case*

If the case starts to sink under its own weight, the fraud examiner might look for a less demanding legal theory, break the case down into smaller components (e.g., prove one set of charges against one set of defendants before pursuing the other), or look for an informant or inside witness. The objective in every complex case is to break it down to its essentials and make it as simple and clear as possible.

**Stage Two: Obtaining Direct Evidence**

In many cases cooperation from a co-conspirator or other insider is a necessity, either because the case is so complicated that it is otherwise unmanageable, or a key element—such as cash payments in a corruption case or the full extent of wrongdoing or intent in a fraud case—cannot be proved circumstantially. In some cases, the objective of the circumstantial stage is not so much to obtain evidence to convict the ultimate defendant, but rather to identify and turn an inside witness.

Ideally, the least culpable witness should be approached first. In a corruption case, this might be the "bag man," a subordinate. Or, if the only choice is the payer or taker, usually the payer is the better choice. A jury will react negatively if its members believe that the witness is more culpable than the defendant. A decision must also be made about how to convince the witness to assist. Ideally, to preserve the witness' credibility, the fewer concessions the better. Remember that immunity might be given only with the consent of the court.

Remember, too, that even the most self-incriminating testimony of a co-conspirator must be corroborated. Testimony from the insider should mesh with and augment the circumstantial evidence, not replace it. The credibility of a turned witness can become the central issue in the case and distract the jury from the strength of the circumstantial evidence. If nonessential testimony from a co-conspirator cannot be corroborated, don't use it.

# INTRODUCTION

Be aware that cooperating, culpable witnesses in a white-collar case often minimize their role to avoid embarrassment, even if protected from legal consequences, and are prone to describe themselves more as observers than participants. This is very damaging to credibility, and must be overcome before such witnesses can be perceived as believable.

**Stage Three: Sealing the Case through Examination of the Subject**
Circumstantial evidence might be explained away, and direct testimony impeached or rebutted. The best witness against the suspect might be himself. The suspect's admissions might provide otherwise missing elements. "False exculpatories"—lies offered to explain or justify conduct—might be the best evidence of intent. False denials of cash deposits in a corruption case might indicate an illicit source; false explanations for fraudulent representations might help prove that the original misstatements were intentional.

To be effective, impeachment must show real, not apparent or explainable contradictions, and must focus on central, not tangential or trivial points. Attempted impeachment fails many times because the plaintiff has not laid a sufficient foundation to show that the defendant's statements were knowingly false.

To adequately prepare the fraud examiner to understand and respond to the complex nature of fraud, the remaining material is divided into four sections: Financial Transactions and Fraud Schemes, Law, Investigation, and Fraud Prevention and Deterrence.



# ANALYZING DOCUMENTS

The fraud examiner will usually obtain a great deal of documentary evidence when conducting fraud investigations. It is critical that the examiner understand the relevance of this evidence and how it should be preserved and presented. Examiners should always keep in mind that documents can either help or hurt a case, depending on which ones are presented and how they are presented. Examiners should strive to make certain that all relevant documents are included, and all irrelevant documents are eliminated. Many examiners pay too much attention to documents. It is easy to get bogged down in detail when examining records and to lose sight of a simple fact: documents do not make cases; witnesses make cases. The documents make or break the witness. So-called paper cases often confuse and bore a jury.

Basic procedures in handling evidence are required for it to be accepted by the court. Proof must be provided that the evidence is relevant and material. Evidence submitted must be established as authentic and properly identified.

The relevance of documents cannot be easily determined early in a case. For that reason, all possible relevant documents should be obtained. If they are not needed, they can always be returned. Here are a few general rules regarding the collection of documents:
- Obtain original documents where feasible. Make working copies for review, and keep the originals segregated.
- Do not touch originals any more than necessary; they might later have to undergo forensic analysis.
- Maintain a good filing system for the documents. This is especially critical when large numbers of documents are obtained. Losing a key document is an unpardonable sin, and can damage the case. Documents can be stamped sequentially for easy reference.

### Obtaining Documentary Evidence

Documentary evidence may be obtained in a number of ways. It is possible to obtain evidence by consent, if both parties agree. This is the preferred method. Consent can be oral or written. When information is obtained from possible adverse witnesses, or the target of the examination, it is recommended that the consent be in writing. Sample forms are contained in the Appendix section titled Sample Forms. In many cases, however, the

# SOURCES OF INFORMATION

Generally, the examiner's initial efforts in any fraud examination are best spent identifying, collecting, and securing all possible relevant documents. Documents provide the foundation of the case on which the examiner will build the structure of the investigation. Documents can be evidence in establishing that a fraud was committed, in determining the nature and scope of the fraud, and in identifying the parties responsible.

In most fraud examinations, a large proportion of the documentary evidence will come from inside the company at issue, but examiners should remember that external sources can also help provide information necessary to conduct a successful examination. External sources can be particularly crucial in helping investigators locate missing assets; locate witnesses and suspects; determine ownership in vendors, competitors, and other related parties; research the assets and financial condition of suspects; and document lifestyle and background information on suspects. All of this information will help an investigator build a case and will provide the basis for conducting interviews and obtaining confessions later in the investigation.

When external documents are needed, fraud examiners should consider accessing public and non-public records, commercial databases, the Internet, and other valuable sources.

There is a surprising amount of information about both individuals and businesses that can be accessed without a subpoena or other legal process. For instance, there is an enormous amount of information available on the Internet.

This chapter explains the difference between public and non-public records and summarizes some important rules governing the availability of certain types of information. It also explains some of the different types of information available and how each type of information can be used in a fraud examination. Moreover, this chapter outlines where to find popular types of records kept by local, state, and federal sources.

The fraud examiner must be certain that information obtained is done so legally. Records from confidential sources generally cannot be introduced as evidence; in criminal cases, illegally obtained documentary evidence falls under the exclusionary rule (see the Law section of the *Fraud Examiners Manual*). In civil cases, using illegally obtained documentation

**Business Receipts**
- Form (electronic, check, or cash)
- Are all receipts deposited? Where?
- Are business receipts segregated from personal ones?
- Are expenses ever paid with undeposited receipts?
- Arrangements for foreign currency payments
- Trade finance arrangements, letters of credit, etc.

### Direct Methods of Tracing Financial Transactions

A subject's income can be established by the direct or indirect approach. The direct approach, or the specific-items method of proving income, relies on specific transactions, such as sales or expenses, to determine income. The indirect approach relies on circumstantial proof of income. Indirect methods will be discussed in the next section.

To trace financial transactions using the direct method, the examiner must obtain relevant financial records.

### Financial Institutions

Fraud examiners should recognize that in most instances bank records are not readily obtainable. Substantial requirements usually must be met to justify legal process (e.g., subpoena, search warrant, and the like), which banks will customarily demand as a condition for disclosure. Preliminary investigation is of the utmost importance to lay the basis for obtaining such records. More information on banking transactions is contained in the Financial Transactions section of the *Fraud Examiners Manual.*

The availability of investigative avenues often determines whether a promising fraud examination will halt or proceed successfully. Legal advice from a prosecutor or civil counsel should be sought in all such instances. It should also be recognized that bank officials and employees can be questioned by fraud examiners in the same manner as any other potential witnesses and that their responses to proper inquiries might provide important information.

Bank records are perhaps the single most important financial source available to a fraud examiner. In addition to their use as evidence for fraud, a bank's records might provide leads on sources of funds, expenditures, and personal affairs.