**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Action No. 11-cr-355-MSK

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. WAUNITA WEINGART
**2. JOHN PHILLIP GALLEGOS**
3. ALOIS CRAIG WEINGART,

    Defendants

_____

**SENTENCING STATEMENT AND
MOTION FOR NON-GUIDELINE STATUTORY SENTENCE**
_____

    John Gallegos, by and through his attorneys William L. Taylor and Darlene A. Bagley of the law firm Ridley, McGreevy & Winocur, P.C., moves this court for a statutory variant sentence of time served to be followed by a term of supervised release. In support of this Motion, Mr. Gallegos states as follows:

**The Procedure to Be Followed**

    Consistent with the directions given in *Gall v. United States,* 552 U.S. 38, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007), this Court is required to begin its sentencing analysis with a correct calculation of the advisory sentencing guidelines. The guidelines, said the Court, are, "[a]s a matter of administration and to secure nationwide consistency," the "starting point and the initial benchmark." *Id.* at 596. After calculating and considering the advice of the guidelines, the court must then turn to an "individualized assessment" of the case

1

"based on the facts presented." *Id.* at 597. That assessment must be conducted within the mandatory framework of 18 U.S.C. § 3553(a). Mr. Gallegos states that he has no objection to the Guidelines as applied.

### Having Properly Calculated the Guidelines, Neither Mr. Gallegos Nor This Court is Required to Consider a Guideline-Driven Departure, Although a Departure Pursuant to U.S.S.G. § 5H1.4 is Warranted.

Mr. Gallegos could seek a guideline-based "downward departure" pursuant to U.S.S.G. §5H1.4. Though the guidelines do not readily encourage downward departures based on a defendant's physical condition, they recognize that an extraordinary physical impairment may provide good cause for such a departure; specifically, "in the case of a seriously infirm defendant, home detention may be more efficient and less costly than, imprisonment." *U.S.S.G. §5H1.4.* Thus, a downward departure would be warranted if the Court finds Mr. Gallegos' medical impairments to be "extraordinary." *See, e.g., United States v. Willis,* 322 F.Supp.2d 76 (D. Mass. 2004).

As discussed by the court in *Willis, supra*,

> Extraordinary cannot mean—only those conditions which the BOP cannot handle. It cannot be that if the BOP can accommodate a given medical condition, it is by definition *not* extraordinary. If that were so, there would be no need for the second sentence (of U.S.S.G. §5H1.4), balancing costs of home detention and incarceration. Nor would there be any need for the modifier, "adequately." The Bureau of Prisons can take care of a given individual, but at a cost that makes no sense given the other purposes of sentencing. Moreover, that care may not be "adequate" to the task.

*Willis,* 322 F.Supp.2d at 84. The court noted that it was not of great significance that the government had produced evidence to suggest that the Bureau of Prisons could adequately care for the defendant as the court "[had] never had a

2

case before [it] in which the Bureau of Prisons suggested that it did not have the capacity to care for a defendant."[1]  *Id.*

Following a thorough discussion of the reasoning behind the departure[2] as well as an analysis of the cost difference between home detention and incarceration, the *Willis* court found application of the departure warranted and sentenced the defendant to two years of probation.  *Id.* at 85.

In *U.S. v. Rausch*, 570 F.Supp.2d 1295 (D. Colo. 2008), the Court underwent a thorough analysis of the departure authorized under U.S.S.G. §5H1.4, with many of the cases discussed from the era when the Sentencing Guidelines were considered mandatory.  *Rausch*, 570 F.Supp.2d at 1304-05.  The Court cited, among other cases, *Willis, supra,* and *U.S. v. Blarek*, 7 F.Supp.2d 192 (E.D.N.Y. 1998) (defendant convicted of conspiracy to commit racketeering and money laundering granted downward departure to three years supervised release because of HIV-positive status) in support of its order to impose a variant sentence of probation for the defendant.  *Id.*

As will be discussed in greater detail *infra,* Mr. Gallegos submits there is abundant evidence to support a finding that a departure pursuant to U.S.S.G. §5H1.4 is warranted and appropriate in his case as well.  Such a departure would be based both on his HIV-positive diagnosis (which occurred in 2011, years after

---

[1] The government has produced a similar letter in this case, with BOP Western Regional Medical Director describing treatment of individuals diagnosed with HIV as "routine."  [Doc. 261].

[2] As evidenced by the purposes of the Guidelines, the U.S.S.G. §5H1.4 departure addresses two main concerns:  recidivism ("What are the chances that a defendant of this age or medical condition would be a recidivist?") and incapacitation ("With respect to an elderly (or ill) defendant, what are the chances that incarceration would be a death sentence?").  *Id.*at 83.

3

the dates of offense here) and on safety concerns stemming from the combination of his incredibly passive demeanor and his homosexuality.  *See U.S. v. Blarek*, 7 F.Supp.2d 192 (E.D.N.Y. 1998) (*citing U.S. v. Wilke,* 995 F.Supp. at 829–30 (N.D.Ill.1998) (defendant's "sexual orientation and his passive, meek demeanor" exposing him to assault while in custody supported reduction in sentence)).   This exercise is unnecessary, however, as the Court must ultimately impose a sentence in accordance with the factors set forth in 18 U.S.C. §3553(a).  As the *Rausch* Court found,

> Title 18 §3553(a) provides evaluative criteria to restore balance between the order of society emphasized by the retributivist approach and the utilitarian view that every human being must be treated with respect for his or her individual circumstances. The stated criteria may clash, and not all apply in each case. The criteria also point to individuated considerations: No one size fits all. The object of this balancing process is to achieve not a perfect or a mechanical sentence, but a condign one—one that is decent, appropriate and deserved under all attendant circumstances.

*Rausch*, 570 F.Supp.2d at 1305.  In Mr. Gallegos' case, a condign sentence would be the same pursuant to a U.S.S.G. §5H1.4 departure or an application and analysis of the 18 U.S.C. §3553(a) factors:  a condign sentence would be a sentence of time served with a term of supervised release to follow.

### Application of 18 U.S.C. § 3553(a) to Mr. Gallegos' Case

In analyzing and applying the factors set forth in 18 U.S.C. §3553(a), the Court ultimately strives to impose a sentence "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."

4

*1. The Nature and Circumstances of the Offense*

Mr. Gallegos stands before this Court for sentencing on a one-count information to which he pleaded guilty on February 11, 2013. Between at least 2005 and 2008, Mr. Gallegos owned a house located at 7603 California Avenue Southwest in Seattle, Washington. This property was refinanced three separate instances in this time period. As part of each refinance, a loan application was submitted to the lending bank to determine if minimum qualifications were met. At the end of the loan applications, all of which had been prepared by Mr. Gallegos' mother Waunita Weingart, there was a statement signed by Mr. Gallegos as the borrower, representing to the bank that he had read the entirety of the loan application, and the information contained therein was truthful and accurate. Mr. Gallegos, however, had not read all of the information in the application submitted to the bank and, thus, had no knowledge whether said information was truthful and accurate.

Mr. Gallegos understands and appreciates the serious nature of his offense. Because of Mr. Gallegos' representation to the bank that the information in the application was truthful and accurate—a representation he could not truthfully have made as he had not reviewed the application and did not know its contents, the lending bank proceeded with the application and ultimately funded the refinance.

*2. The History and Characteristics of Mr. Gallegos, the Defendant*

Personal History:

5

Mr. Gallegos is a 41-year old man who has no criminal record whatsoever and who has been supported by, but also misled by, his reliance on family (namely, his mother) much of his life.  He currently works as a flight attendant for a domestic airline company and has been in a committed relationship with his partner for over fifteen years.  They have a registered domestic partnership in both the State of Colorado and the State of Washington.  Mr. Gallegos received a college degree in aviation through an online program with Rochville University in Maryland.

Psychiatric Assessment:

Mr. Gallegos is an exceedingly passive individual—so passive, in fact, that defense counsel enlisted the assistance of psychiatrist Dr. Scott Humphreys to conduct a forensic psychiatric evaluation of Mr. Gallegos.[3]

In his forensic psychiatric evaluation, Dr. Humphreys discusses in detail the interplay between Mr. Gallegos' passive personality, his diagnosis and life with dyslexia, and his relationship with his mother, Waunita Weingart. Specifically, Dr. Humphreys notes that "[t]his combination of personality vulnerabilities and cognitive deficits causes [Mr. Gallegos] to be a person who is easily victimized." [*Humphreys' Evaluation*, p. 8].  Compare Mr. Gallegos, who is described as incredibly trusting by both his father and his partner of fifteen years, with his mother, Waunita Weingart, who is described as domineering, demanding, and requiring of control, and it is of no surprise that Ms. Weingart

---

[3] Dr. Humphreys' *curriculum vita is* attached hereto as Exhibit A, and the forensic psychiatric evaluation itself is attached hereto as Exhibit B.

6

"nurtured" Mr. Gallegos to the point of making all important decisions for him in his life. *Id.*

Dr. Humphreys notes the interplay of this relationship with Mr. Gallegos' passivity and default to "never [be one] to question things," as his father described him:

> It is important to recognize that his mother was not only his business partner, she is his mother. By the very nature of their relationship, children are trusting of their parents. From a young age, Mr. Gallegos struggled in school. His brother was more accomplished and successful and this dynamic continued throughout their lives. Because of this, Mr. Gallegos' mother naturally assumed a more nurturing role with regard to Mr. Gallegos. As a result, this set up a lifelong dynamic that she was in control, while taking care of Mr. Gallegos. This dynamic between Mr. Gallegos and his mother continued into their employer-employee relationship where he was essentially a figurehead and clerical worker and she unilaterally made important decisions.

*Id.* Couple this with Mr. Gallegos' diagnosis with dyslexia, and it becomes understandable why Mr. Gallegos trusted his mother and neglected to challenge her or question any of her actions.

In stating his professional opinion, Dr. Humphreys summarizes the situation as follows:

> These psychiatric conditions of Mr. Gallegos directly relate to the charge to which he has pled, Providing False Information to a Financial Institution. Mr. Gallegos asserts that he did not review information contained in the loan applications. In this report I have offered a psychiatric explanation for his neglect. He is much more likely than a person without these vulnerabilities to be passive and trusting. In this case, he did not review the loan application choosing instead to trust his mother. In this situation, Mr. Gallegos is a very passive person with learning disabilities. His mother was an extremely strong-willed individual. These are the perfect circumstances for Mr. Gallegos to be taken advantage of by his mother. <u>It</u>

7

> is my opinion that this constellation of personality types, cognitive deficits, and relationship dynamics between mother and son should be taken into account when assessing Mr. Gallegos' culpability regarding these alleged crimes.

*Id.* at 9 (*emphasis added*).

Physical Health:

Mr. Gallegos is HIV-positive. He was diagnosed in early 2011—approximately three years after the period of time at issue in the instant offense. Within one month of his diagnosis, Mr. Gallegos sought out and began HIV treatment with Dr. Vy Chu at Capitol Hill Medical in Seattle, Washington. Capitol Hill Medical is a gay-focused clinic that serves the needs of the GLBT community in Seattle. *See attached Exhibit C: Letter from Dr. Vy Chu.* As evidenced by Dr. Chu's letter to this Court, Dr. Chu has Mr. Gallegos on a very strict medical regimen. Strict compliance with this regimen is required as Mr. Gallegos' CD4 counts and his viral load must be closely monitored to ensure that his viral load is within the appropriate range; to ensure that Mr. Gallegos' immune system is properly functioning and not compromised; and to ensure that the medication is working properly and is not compromising Mr. Gallegos' organs' functions. Dr. Chu notes that Mr. Gallegos has been very compliant with his treatment regimen: his routine blood work, his medication, and exercise and dietary regimes.

Dr. Chu, an HIV specialist certified by the American Academy of HIV Medicine, states that treatment of HIV with medication must be monitored closely "because HIV mutates quickly—approximately one thousand times faster than

8

the flu." Because of this, Dr. Chu sees Mr. Gallegos every three to four months to review his levels and his medication—almost twice as much as BOP states they would "routinely" see "an asymptomatic HIV infected inmate like this."

While Mr. Gallegos is currently responding well to his HIV treatment, Dr. Chu expresses concern that any change in Mr. Gallegos' regimen could prove detrimental to his health. Contrary to the BOP's letter, management of HIV is not routine and is much more than just the administration of medication. Dr. Chu states that straying from Mr. Gallegos' regimen of medication, appropriate management of his numbers, and physical exercise could put him at risk of a raised viral load and susceptibility to resistant mutations of the virus. This is more than a mere irritant; it could very possibly be life-threatening. With a raised viral load and a compromised immune system, the exposure to other communicable diseases such as tuberculosis or influenza that is not uncommon in prison settings could lead to serious health consequences for Mr. Gallegos if incarcerated.[4] *See Blarek, supra,* at 212. ("The extent to which inmates are exposed to diseases such as tuberculosis in prison is well documented.. *See Departures for HIV–Infected Defendants, supra,* at 1156–57. ("The incidence of TB in prisons has recently been on the rise, and not surprisingly, those who tend to suffer most are HIV-infected prisoners."). Despite federal authorities' concern

---

[4] Just last week undersigned counsel observed two notices at the Federal Detention Center-Englewood from the medical staff at the Federal Correctional Institute-Englewood giving notice that diagnoses of scabies and of chicken pox/shingles had been made at the facility. Individuals living with HIV are more susceptible to shingles than those in the general population.
http://www.aidsmeds.com/articles/hiv_herpes_shingles_1667_22670.shtml

9

for prisoners' welfare, incarceration is likely to be detrimental to this defendant's health, resulting in a lessening of his present life expectancy.")

### 3. *The Need for the Sentence Imposed*

a. *To reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, and to afford adequate deterrence.*

In *Rausch, supra*, the Court discussed the historical roots of punishment. Specifically, the court restates Lord Justice Denning's view on punishment as "the emphatic denunciation by the community of a crime," reinforcing "the community's respect for its legal and moral standards." *Rausch* at 1304. There must, however, be a restraint on this principle: that is, "that punishment is only justifiable when it is deserved." *Id.*

Here, a sentence of time served with a term of supervised release to follow is deserved. A sentence to a term of supervised release would not and does not minimize the seriousness of the offense. Indeed, the United States Supreme Court does not equate a sentence of probation as a pass:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. *See U.S. v. Knights*, 534 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled.'" (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987))). FN4  Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. *U.S.S.G. §5B1.3.* Most

probationers are also subject to individual "special conditions" imposed by the court.

*Gall*, 522 U.S. 38, 128 S.Ct. at 595.

In the PSIR, Probation recommends several such special conditions of supervision for Mr. Gallegos, including limitations on incurring new lines of credit, specifications as to the application of financial gains towards restitution, and direction as to the payment of restitution.  [Doc. 244, p. R.2].

The seriousness of this offense, when viewed in the full context of the history and characteristics of Mr. Gallegos, is sufficiently addressed with a sentence of time served followed by a term of supervised release.  Mr. Gallegos has demonstrated his respect for the law.  He has accepted responsibility for making the false representations to the bank, as discussed above.  He has been compliant with all conditions of his release on bond as well as responsive to pretrial supervision during the pendency of this case.  [Doc. 244, p.4, para. 7].

The just punishment—the punishment that is deserved in this case—is a sentence of time served with a significant period of supervised release to allow Mr. Gallegos time to make payments towards the restitution owed.  Even the probation officer, noting that Mr. Gallegos is unlikely to participate in any future criminal activity, has no criminal history, is educated, and is employed full-time, states that "it appears that a variant sentence may be warranted."  [Doc. 244, p. R-2].

11

   *b. To protect the public the public from further crimes of the defendant.*

Mr. Gallegos is not a threat to the public. He has no prior criminal history and, as discussed above, has been fully compliant while on pretrial services. The special conditions of supervised release as suggested by probation will suffice to ensure that Mr. Gallegos make the maximum payments he is able towards the restitution amount.

   *c. To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.*

As noted by the probation officer, Mr. Gallegos has no criminal history, has a college degree and the ability to maintain employment, and "it does not appear that he has any institutional needs." [Doc. 244, p. 17, para. 101].

Thus, it remains for this Court to determine what sentence would be sufficient, but not greater than necessary, to provide Mr. Gallegos with needed medical care in the most effective manner. As discussed above, Mr. Gallegos has significant medical needs. In line with the Supreme Court's recognition that a probationary (or, in this case, a supervised release) sentence is not a free ride, many district courts have rejected the advice of the guidelines and imposed probationary-like sentences based largely on findings of a defendant's poor health. *U.S. v. McFarlin,* 535 F.3d 808 (8th Cir. 2008) (upholding sentence of probation and home detention and rejecting guideline sentence of 97-121 months for 56 year-old defendant with coronary artery disease, multiple heart surgeries and "other serious conditions," convicted of conspiracy to distribute 102 grams of crack cocaine); *U.S. v. Rausch,* 570 F.Supp.2d 1295 (D.Colo. 2008) (Kane,

Senior Judge) (49 year-old defendant on dialysis, awaiting kidney transplant, with coronary artery disease and multiple prior surgeries, sentenced to probation, rather than 97-120 month sentence sought by government for child pornography conviction); *U.S. v. Coughlin,* 2008 WL 313099 (W.D. Ark 2008) (unpublished) (former Wal-Mart COO convicted of wire fraud and tax fraud sentenced to 5 years probation, 27 months electronic monitoring, instead of 27-33 month guideline sentence, where defendant suffered from obesity, prior heart attacks, cardiac arrhythmia, hypertension, diabetes and sleep apnea); *U.S. v. Luna,* 2007 WL 1776345 (10th Cir. 2007) (unpublished) (court found a downward departure warranted pursuant to U.S.S.G. §5H1.4 due to the fact that defendant had AIDS, although the departure was not as large as requested as the court noted the fact that defendant had AIDS when he committed the offense at issue).

Similarly, the court in *United States v. Blarek, supra,* found the both defendants' vulnerability and one of the defendant's HIV-positive status to be grounds warranting a downward departure.[5]  The *Blarek* court noted that ancillary issues related to a defendant's homosexuality may support a reduction in sentence:

> The reality is that homosexual defendants may need to be removed from the general prison population for their own safety. This would amount to a sentence of almost solitary confinement, a penalty more difficult to endure than any ordinary incarceration. *See, e.g., U.S. v. Lara*, 905 F.2d at 603 ("severity of [defendant's] prison term is exacerbated by his placement in solitary confinement as the only means of segregating him from other

---

[5] This case, too, was decided during the time when Sentencing Guidelines were considered mandatory rather than discretionary.  Thus, the downward departure was the primary mechanism by which the courts could take individual defendant's characteristics into consideration.  *Rausch* at 1304.

13

inmates").

*Blarek*, 7 F.Supp.2d at 211.  The court went on to recognize the proposition that the likelihood of a defendant being abused in prison is an appropriate factor for a court to consider in fashioning an appropriate sentence.  *Id.* at 211-12 (citing *Koon v. U.S.,* 518 U.S. at 111-12 (departure based upon "susceptibility to abuse in prison"**\*212** ); *U.S. v. Gonzales,* 945 F.2d 525, 527 (2d. Cir. 1991) (departure based upon defendant's small frame and feminine looks resulting in extreme vulnerability in prison); *U.S. v. Lara*, 905 F.2d at 605 ("Extreme vulnerability of criminal defendants is a ... proper ground for departure under §3553(b)."); *United States v. Ruff,* 998 F.Supp. at 1359 (M.D.Ala.1998) (combined cumulative effect of defendant's "status as a gay man, an effeminate man, [and] survivor of sexual abuse" on his vulnerability in prison called for departure); *United States v. Wilke,* 995 F.Supp. at 829–30 (N.D.Ill.1998) (defendant's "sexual orientation and his passive, meek demeanor" exposing him to assault while in custody supported reduction in sentence); *U.S. v. Shasky*, 939 F.Supp. 695, 696 (D. Neb. 1996) (outside of the heartland in part because defendant was "unusually susceptible to abuse in prison").  Attached as Exhibit D is an affidavit from Michael Martinez, retired Deputy Chief United States Probation Officer for the District of Colorado.  Mr. Martinez attests that, if other inmates were to learn of Mr. Gallegos' sexual orientation, he could become the target of sexual abuse.  [*See Martinez Affidavit,* p. 3].  As such, "authorities would need to maintain almost constant contact with Mr. Gallegos in order to assure his safety, given his sexual preference."  *Id.*  Fearing the possibility of violence, especially due to his lack of any criminal

14

history and his passive character, Mr. Gallegos may be forced to request placement in the Special Housing Unit ("SHU") where he would be confined to his cell for 23 hours a day.  *Id.*

Not only would Mr. Gallegos' sentence be "greater than necessary" if imprisoned, it would also be of great (and unnecessary) expense to taxpayers. In addition to the concern that Mr. Gallegos' strict treatment regimen would not be followed and, thus, his health would deteriorate if incarcerated as discussed *infra*, the sheer cost alone of housing an individual with significant medical needs such as Mr. Gallegos is staggering (approximately three times the cost of housing an inmate without such needs).  *Id.* at 4.

## Conclusion

The object of an 18 U.S.C. § 3553(a) analysis and the balancing process it sets forth "is to achieve not a perfect or a mechanical sentence, but a condign one—one that is decent, appropriate, and deserved under all attendant circumstances."  *Rausch*, 570 F.Supp.2d at 1305.

Mr. Gallegos has no criminal history.  He has been incredibly compliant with pretrial supervision and has no institutional needs.  He has health insurance that allows him to pay for the substantial costs associated with his medical treatment.  His medical needs are substantial and, if not properly continued, could prove life-threatening.  The costs associated with his incarceration are unnecessarily excessive, and the risks unjustifiably high, especially when mindful of (1) the nature and circumstances of the offense to which Mr. Gallegos pleaded guilty, (2)  all of the attendant circumstances of his behavior and nature as

15

described in detail by Dr. Humphreys, and as otherwise evidenced by the PSIR; and (3) his ability to maintain gainful employment and pay restitution over time.

Accordingly, and based upon the foregoing, Mr. Gallegos respectfully requests that this Motion for Non-Guideline Statutory Sentence be granted, and that a sentence of time served with a term of supervised release be imposed.

Respectfully submitted this 22nd day of April, 2013.

>/s/ *William L. Taylor*
>William L. Taylor, #21098
>
>*/s/ Darlene A. Bagley*
>Darlene A. Bagley, #35728
>RIDLEY, MCGREEVY & WINOCUR P.C.
>303 16th Street, Suite 200
>Denver, CO  80202
>Telephone:  (303) 629-9700

16

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 22nd day of April, 2013, I served a true and correct copy of the foregoing **SENTENCING STATEMENT AND MOTION FOR NON-GUIDELINE STATUTORY SENTENCE** via CM/ECF to all parties listed therein including:

Linda Kaufman
Martha Paluch
Assistant United States Attorney
United States Attorney's Office
1225 Seventeenth Street, Suite 700
Denver, Colorado  80202
Telephone:  (303) 454-0100
FAX:  (303) 454-0401
E-mail:  Linda.Kaufman@usdoj.gov
Email:  Martha.Paluch@usdoj.gov
Attorney for Government

U.S. Probation Officer Nicole Peterson
(via U.S. Mail)

*s/ Holli M. Baker*
Holli M. Baker