IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 11-cr-355-MSK-2

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.    WAUNITA WEINGART,
2.    **JOHN PHILLIP GALLEGOS,**
3.    ALOIS CRAIG WEINGART,

                              **RESTRICTED - LEVEL 2**

    Defendants.

---

**GOVERNMENT'S SENTENCING STATEMENT AND RESPONSE TO DEFENDANT JOHN PHILLIP GALLEGOS' SENTENCING STATEMENT AND MOTION FOR NON-GUIDELINE STATUTORY SENTENCE**

---

    The United States of America, by and through United States Attorney John F. Walsh and Assistant United States Attorneys Linda Kaufman and Martha Paluch, hereby respectfully submits its Sentencing Statement and Response to the Defendant's Sentencing Statement and Motion for Non-Guideline Statutory Sentence (Doc. 266):

    1.    The government's position, as stated in the Plea Agreement (Doc. 215 at 6-7), is that by signing the applications described in the Stipulation of Facts for the refinancing of his 2603 California Avenue property, the defendant acted with deliberate ignorance. That is, he deliberately blinded himself to the fact that there was a high probability that his applications contained false statements about his income and assets. He chose not to read the applications or otherwise acquire knowledge of their specific contents in order to avoid having actual knowledge of the falsehoods they contained.

    2.    The deliberate ignorance theory applies in this case because at the time the defendant obtained these loans, he knew that he did not have the assets or income that

1

would enable him to make the monthly payments on the loans. He earned approximately $2,000 per month, his annual income was only about $20,000 to $24,000, and he had no other income. He owned three properties, 430 E. 6th Avenue, Denver, Colorado, 141 Lost Angel Road, Boulder, Colorado, and 7603 California Avenue, SW, Seattle, Washington. Each of those properties was encumbered by at least one 100% or nearly 100% mortgage. The defendant had worked in the mortgage brokerage and title insurance business for years and had been licensed by the State of Colorado as a real estate title producer since 1999. He knew that the lenders would base their determination as to whether to approve his loans on the information set forth in his signed applications. It is the government's position that he therefore chose not to read the information set forth on the applications so that he could enjoy the benefit of the loans and later claim he had no idea that his applications contained material falsehoods.

3. Predictably, the applications did contain numerous material falsehoods. (See, Plea Agreement Doc. 213 at 5-11). The applications made it appear that the defendant would be able to repay each of the four new loans, when in fact, he could not: they substantially overstated his income (stating that he earned more each month than he did in an entire year); they substantially overstated his bank balances; and they falsely stated that he owned numerous other particular parcels of real estate which, in fact, he never owned. (There were ten such parcels listed on the application which is the basis of his count of conviction.)

4. Although the Presentence Investigation Report states that "it does not appear that the defendant has anything to show financially for his involvement in the instant offense," it is clear that he benefitted from each of the four loans described in the

2

plea agreement, as follows:

    a.    Approximately $352,000 of the proceeds of the April 2005 loan was used to refinance the defendant's outstanding mortgage on his California Avenue property.

    b.    $53,500 of the proceeds of the October 2007 loan were transferred to the defendant's personal accounts, and approximately $83,000 of the proceeds were applied to payments associated with his training as a pilot and the cost of the lease and operating expenses of the aircraft he flew.

    c.    $3,000 of the proceeds of the January 2008 loan was transferred to the defendant's personal account, and approximately $158,000 was used to pay expenses related to the plane he piloted.

    d.    The defendant drew the entire $100,000 line of credit, and deposited it to his personal account, gave $50,000 to Waunita Weingart. See Attachment 1, Affidavit of Dana Chamberlin.

The government does not dispute the fact that a large portion of the proceeds of the above-described loans benefitted Waunita Weingart, that Craig Weingart also benefitted, and that benefitted from the use of the plane as well.

    5.    As a result of the defendant's deliberate ignorance, the lenders lost over $965,000.00.

    6.    The record, as it now stands, contains material inaccuracies about the defendant's personal history, which should be corrected. First, the defendant estimated that he refinanced his California Avenue property twice. (Doc. 266-1 at 4). In fact, he

purchased that property, 7603 California Ave SW, Seattle, Washington in July 2001 (Attachment 2 at 1-4) and refinanced it in December 2002 (Id. at 5-8), April 2005 (Id. at 9-10), October 2007 (Id. at 11-14) and January 2008. (Id. at 15-18). Second, the record, as it now stands, reflects that the defendant purchased his Boulder house in 2006. (Doc. 266-1 at 2 and 3). In fact, he and Waunita Weingart purchased that property, 141 Lost Angel Road, in March 2002 (Attachment 3 at 1). The defendant refinanced it in his name alone twice in March 2002 (Id. at 2-6), June 2002 (Id. at 7-8), February 2004 (Id. at 9-10), August 2005 (Id. at 11-12), December 2006 (Id. at 13-14), and April 2008 (Id. at 15-16). Third, the record reflects that the defendant purchased a townhouse near 6th Avenue in 2004. (Doc. 266-1 at 3, Report of Scott Humphreys, M.D.). In fact, the defendant purchased this property, 430 6th Avenue, Denver, Colorado, a townhouse, in September 2000 (Attachment 4 at 1-3), and refinanced it in his name alone in September 2000 (Id. at 4-5), June 2001 (Id. at 6-8), July 2001 (Id. at 9-11), November 2001 (Id. at 12-18), and December 2001. (Id. at 19-20).

7. The government does not dispute that the defendant has been diagnosed as HIV-positive. His physical condition, however, is not extraordinary, and warrants neither a downward departure nor the sentence of no incarceration advocated by the defendant. His condition does not prevent him from being employed or traveling extensively. He does not have an "inordinate number of potentially serious medical conditions" and is not at an age where such conditions are likely to invariably get worse; nor is he in extremely poor health, with complex needs for medical care such as kidney dialysis, an organ transplant, or a colostomy bag, as in the cases upon which the defendant relies. See, e.g., United States v. Willis, 322 F. Supp. 2d 76 (D. Mass 2004) and United States v. Rausch, 570 F. Supp.

4

1295 (D.Colo 2008).

8.  James Pelton, M.D., Medical Director for the Western Region of the Bureau of Prisons, makes clear in his letter to the Court that the Bureau of Prisons is not only capable of managing the defendant's condition, but also that his condition is not unusual or extraordinary among the inmate population. (Doc. 261).

9.  Further, the government does not agree that the defendant would be subjected to the abuses cited by Michael Martinez in his affidavit (Doc. 266-3 at 3-4). Indeed, Mr. Martinez' comments about conditions in the Federal Bureau of Prisons prior to his 2000 retirement as a probation officer, and in particular, the distribution of inmates' Presentence Investigation Reports among the inmate population are out of date. As Mr. Chris Synsvoll, Supervisory Attorney for the Federal Bureau of Prisons, states in his letter to the Court, the Bureau of Prisons changed its policy regarding the availability of presentence reports among the inmate population in November 2002. Inmates are no longer permitted to possess copies of their Presentence Reports due to concerns for their safety. In addition, Mr. Synsvoll explains the intake screening measures in place to prevent sexual abuse and to avoid segregated housing. (Attachment 5)

10.  The government's position is that a sentence to time served (less than a full day in jail) would unduly minimize the seriousness of the defendant's offense. But for his criminal behavior, the lenders would not have lost more than $965,000.00. The government does not believe that a sentence to time served would deter other white collar offenders who may be motivated to claim ignorance to avoid the consequences of their criminal acts. (See United States v. Kuhlman, 711 F.3d 1321, 1328 (11th Cir. 2013). (A sentence of probation for time served in a $3 Million health care fraud case failed "to achieve an

5

important goal of sentencing in a white-collar crime prosecution: the need for general deterrence.").

13. Accordingly, the government recommends that the defendant be given a sentence of incarceration within the applicable guidelines range, to be followed by a 5-year term of supervised release.

Respectfully submitted this 29th day of April, 2013.

JOHN F. WALSH
United States Attorney


By: *s/ Linda Kaufman*
Linda Kaufman
Assistant United States Attorney
1225 Seventeenth Street, Suite 700
Denver, Colorado 80202
Telephone: (303) 454-0100
Facsimile: (303) 454-0404
E-mail: Linda.Kaufman@usdoj.gov


By: *s/ Martha Paluch*
Martha Paluch
Assistant United States Attorney
1225 Seventeenth Street, Suite 700
Denver, Colorado 80202
Telephone: (303) 454-0100
E-mail: Martha.Paluch@usdoj.gov